**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| NORMA PELLEGRIN and MARK PELLEGRIN | Civil Action No. 2:26-cv-00830 |
| Plaintiffs, | JUDGE: Lance Africk |
| vs. | MAGISTRATE: Janis van Meerveld |
| ZOLL MEDICAL CORPORATION, | |
| Defendant | |

**PLAINTIFFS' AMENDED COMPLAINT FOR DAMAGES**

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Norma Pellegrin and Mark Pellegrin, who, pursuant to *Rule 15 of the Federal Rules of Civil Procedure*, hereby amend their *Original Petition for Damages* to read *in toto* as follows:

1.

Plaintiff Norma Pellegrin is a resident of Louisiana.

2.

Plaintiff Mark Pellegrin is a resident of Louisiana.

3.

Defendant Zoll Medical Corporation is a corporation organized under the laws of Massachusetts with a principal place of business in Massachusetts.

4.

This Court has subject matter jurisdiction over this action pursuant to 28 USCS § 1332, as complete diversity of citizenship exists between the parties and the amount in controversy exceeds seventy-five thousand dollars, exclusive of interest and costs.

5.

Norma Pellegrin and Mark Pellegrin are citizens of Louisiana.

6.

Zoll Medical Corporation is a citizen of Massachusetts, as it is a corporation organized under the laws of Massachusetts with its principal place of business in Massachusetts.

7.

No plaintiff is a citizen of the same state as the defendant.

8.

The amount in controversy exceeds seventy-five thousand dollars, exclusive of interest and costs, based on the nature and extent of Norma Pellegrin's injuries, past and future medical expenses, pain and suffering, loss of enjoyment of life, and Mark Pellegrin's loss of consortium damages.

9.

This Court has personal jurisdiction over Zoll Medical Corporation pursuant to La. R.S. § 13:3201 because Zoll Medical Corporation placed the LifeVest wearable cardioverter defibrillator into the stream of commerce for use in Louisiana, the product caused tortious injury in Louisiana, and this action arises from that tortious injury.

10.

Venue is proper in this Court pursuant to 28 USCS § 1391, as a substantial part of the events giving rise to the claims occurred in the Eastern District of Louisiana, including the incident on March 5, 2025, all of Norma Pellegrin's medical treatment, and Plaintiffs' domicile.

11.

Norma Pellegrin is a seventy-five-year-old woman with a history of cardiac disease.

12.

In February 2025, Norma Pellegrin suffered a non-ST elevation myocardial infarction with heart failure.

13.

Following her myocardial infarction, Norma Pellegrin was under the care of cardiologists at the Cardiovascular Institute of the South in Houma, Louisiana.

14.

As part of her cardiac care, Norma Pellegrin was prescribed a LifeVest wearable cardioverter defibrillator.

15.

Prior to March 5, 2025, Norma Pellegrin had chronic neck pain and a history of cervical spine surgery at C5-6.

16.

Zoll Medical Corporation designs, manufactures, markets, and distributes the LifeVest wearable cardioverter defibrillator.

17.

The LifeVest is a Class III medical device intended to detect life-threatening arrhythmias and deliver electrical shocks to restore normal heart rhythm.

18.

Zoll Medical Corporation placed the LifeVest into the stream of commerce for use by patients throughout the United States, including Louisiana.

19.

The LifeVest prescribed to Norma Pellegrin was manufactured by Zoll Medical

Corporation.

20.

Norma Pellegrin used the LifeVest as prescribed by her physician and as intended by Zoll Medical Corporation.

21.

On March 5, 2025, Norma Pellegrin was wearing the LifeVest while entering cardiac rehabilitation.

22.

While entering cardiac rehabilitation, the LifeVest malfunctioned and delivered an inappropriate discharge.

23.

The discharge was inappropriate because Norma Pellegrin was not experiencing a life-threatening arrhythmia at the time.

24.

The force of the discharge caused Norma Pellegrin's neck to snap forward violently.

25.

The LifeVest then delivered an additional discharge, causing a separate jolt to Norma Pellegrin's body.

26.

Norma Pellegrin immediately experienced severe pain in her cervical spine and neck.

27.

On March 5, 2025, Norma Pellegrin sought emergency medical care at Thibodaux Regional Health System for evaluation following the defibrillator discharge.

28.

Norma Pellegrin was evaluated by her cardiologist, Dr. Dikshya Sharma, on March 12, 2025, at the Cardiovascular Institute of the South in Houma, Louisiana.

29.

The medical records from the March 12, 2025 cardiology visit explicitly document that Norma Pellegrin "had defective lifevest that discharged on her while entering cardiac rehab."

30.

The medical records from the March 12, 2025 visit further state "inappropriate life vest discharge ± defective life vest."

31.

Dr. Sharma's notes from March 12, 2025, confirm that Norma Pellegrin's symptoms were acutely exacerbated following the LifeVest incident.

32.

Following the March 5, 2025 incident, Norma Pellegrin underwent diagnostic imaging of her cervical spine.

33.

An MRI of the cervical spine was performed on April 25, 2025, at TGMC MRI Imaging Center.

34.

The April 25, 2025 MRI documented multilevel cervical pathology, including disc bulges and herniations with canal and foraminal stenosis.

35.

Specifically, the MRI showed a right paracentral disc protrusion at C3-C4 compressing the

thecal sac and resulting in mild narrowing of the anterior spinal canal.

36.

The MRI showed a dorsal disc protrusion at C4-C5 compressing the thecal sac and nearly contacting the ventral spinal cord, with disc protrusion combined with ligamentum flavum hypertrophy producing mild-to-moderate central canal narrowing and mild foraminal stenosis bilaterally.

37.

The MRI showed a disc bulge at C5-C6 compressing the thecal sac and nearly contacting the ventral cord, with disc bulge combined with ligamentum flavum hypertrophy and uncinate hypertrophic changes producing moderate narrowing of the central canal as well as moderate right and moderate to severe left foraminal stenosis.

38.

The MRI showed a dorsal disc protrusion at C6-C7 compressing the thecal sac and nearly contacting the ventral cord.

39.

On June 17, 2025, Norma Pellegrin was evaluated by Dr. Andrew Barker at Haydel Spine and Pain for chronic neck pain and consideration for invasive cervical intervention.

40.

Dr. Barker's medical records from June 17, 2025, document that "patient symptoms were acutely exacerbated in March of this year following an incident where the LifeVest she was wearing malfunctioned and 'exploded' causing her neck to acutely snap forward followed by an additional discharge resulting in a separate jolt."

41.

Dr. Barker's examination on June 17, 2025, revealed tenderness on palpation of the cervical spine and cervical paraspinal muscles bilaterally, pain with extension, positive axial loading, and positive Spurling bilaterally.

42.

Dr. Barker's assessment noted that Norma Pellegrin had a history of traumatic injury following a LifeVest malfunction resulting in significant exacerbation of cervical radiculopathy and cervical spondylosis.

43.

Dr. Barker recommended proceeding with cervical epidural steroid injection to address persistent radicular symptoms.

44.

On July 7, 2025, Norma Pellegrin underwent a cervical interlaminar epidural steroid injection at the C7-T1 level under intravenous sedation at Southern Surgical Center in Gray, Louisiana.

45.

The procedure was performed by Dr. Andrew Barker.

46.

At follow-up on July 15, 2025, Norma Pellegrin reported approximately eighty percent relief following the epidural steroid injection, with her pain level reduced from nine out of ten to five out of ten.

47.

At follow-up on September 9, 2025, Norma Pellegrin continued to endorse persistent

multifactorial neck pain following the traumatic LifeVest explosion.

48.

Norma Pellegrin continues to experience chronic neck pain, cervical radiculopathy, and functional limitations as a result of the March 5, 2025 incident.

49.

The March 5, 2025 malfunction of the LifeVest acutely exacerbated Norma Pellegrin's pre-existing cervical spine condition and caused traumatic injury.

50.

Prior to the March 5, 2025 incident, Norma Pellegrin had chronic neck pain but was able to function and participate in cardiac rehabilitation.

51.

The violent snapping forward of Norma Pellegrin's neck caused by the LifeVest's inappropriate discharge directly caused acute trauma to her cervical spine.

52.

The traumatic injury from the LifeVest malfunction resulted in the multilevel disc pathology, central canal stenosis, and foraminal stenosis documented on the April 25, 2025 MRI.

53.

The traumatic injury from the LifeVest malfunction necessitated the cervical epidural steroid injection performed on July 7, 2025.

54.

Norma Pellegrin continues to suffer ongoing pain, functional limitations, and diminished quality of life as a direct result of the injuries caused by the LifeVest malfunction.

55.

At all relevant times, Norma Pellegrin used the LifeVest as intended by Zoll Medical Corporation.

56.

At all relevant times, Norma Pellegrin used the LifeVest as prescribed by her physician.

57.

At all relevant times, Norma Pellegrin used the LifeVest in a reasonably anticipated manner.

58.

Entering cardiac rehabilitation while wearing the LifeVest was a normal, expected, and reasonably anticipated use of the device.

59.

Norma Pellegrin did not misuse the LifeVest or use it in any unintended or unforeseeable manner.

60.

The LifeVest used by Norma Pellegrin was defective when it left Zoll Medical Corporation's control.

61.

The defective condition of the LifeVest was a cause-in-fact and legal cause of Norma Pellegrin's injuries and damages.

62.

Multiple medical records document that the LifeVest was defective and malfunctioned.

63.

The LifeVest's delivery of inappropriate shocks when no life-threatening arrhythmia was present demonstrates that the device deviated from Zoll Medical Corporation's own manufacturing specifications and performance standards.

64.

A properly functioning LifeVest manufactured in accordance with Zoll Medical Corporation's specifications and performance standards would not have delivered shocks to Norma Pellegrin on March 5, 2025, as she was not experiencing a life-threatening arrhythmia.

65.

The LifeVest used by Norma Pellegrin deviated in a material way from otherwise identical LifeVest products manufactured by Zoll Medical Corporation that conform to the manufacturer's specifications.

66.

The specific unit of the LifeVest used by Norma Pellegrin failed to perform in accordance with Zoll Medical Corporation's own design specifications and quality control standards.

67.

The LifeVest is a Class III medical device regulated by the United States Food and Drug Administration.

68.

Upon information and belief, the LifeVest received marketing authorization through the FDA's 510(k) premarket notification process.

69.

Upon information and belief, the FDA's 510(k) clearance of the LifeVest was based on

substantial equivalence to predicate devices and did not involve comprehensive review of the specific manufacturing defect alleged in this case.

70.

The defect alleged in this case is the specific LifeVest unit's deviation from Zoll Medical Corporation's own manufacturing specifications and performance standards, resulting in inappropriate discharge.

71.

This manufacturing defect was not reviewed or approved by the FDA.

72.

Plaintiffs' claims are parallel state law claims that do not impose requirements different from or in addition to federal requirements.

73.

Plaintiffs' claims are based on the specific device's failure to conform to Zoll Medical Corporation's own specifications and standards, not on any alleged inadequacy of federal requirements.

74.

Plaintiffs do not seek to impose any state law requirements that conflict with or add to federal requirements applicable to the LifeVest.

75.

Plaintiffs' claims would exist even in the absence of federal regulation, as they are based on traditional state law duties not to manufacture defective products that deviate from the manufacturer's own specifications.

76.

Mark Pellegrin is the husband of Norma Pellegrin.

77.

As a result of the injuries sustained by Norma Pellegrin, Mark Pellegrin has suffered and continues to suffer loss of consortium.

78.

Mark Pellegrin's loss of consortium includes loss of companionship, love, affection, services, and society of his wife.

79.

Norma Pellegrin's ongoing pain, medical treatment, and functional limitations have significantly affected her relationship with Mark Pellegrin.

80.

Mark Pellegrin has been deprived of the comfort, companionship, and assistance of his wife as a result of her injuries.

81.

Plaintiff Norma Pellegrin repeats and realleges the allegations set forth in paragraphs 1 through 80 as if fully set forth herein.

82.

Zoll Medical Corporation is a manufacturer of the LifeVest wearable cardioverter defibrillator.

83.

Zoll Medical Corporation designed, manufactured, marketed, and distributed the LifeVest used by Norma Pellegrin.

84.

The LifeVest used by Norma Pellegrin was unreasonably dangerous in construction or composition.

85.

The LifeVest deviated in a material way from Zoll Medical Corporation's own specifications and performance standards for the product.

86.

The LifeVest deviated in a material way from otherwise identical LifeVest products manufactured by Zoll Medical Corporation that conform to the manufacturer's specifications.

87.

A properly manufactured LifeVest conforming to Zoll Medical Corporation's specifications would not deliver inappropriate shocks in the absence of life-threatening arrhythmias.

88.

The LifeVest used by Norma Pellegrin malfunctioned and delivered inappropriate shocks when no life-threatening arrhythmia was present, demonstrating that it deviated from Zoll Medical Corporation's specifications.

89.

Medical records from the Cardiovascular Institute of the South dated March 12, 2025, explicitly document that Norma Pellegrin "had defective lifevest that discharged on her while entering cardiac rehab" and note "inappropriate life vest discharge ± defective life vest."

90.

Medical records from Haydel Spine and Pain dated June 17, 2025, document that "the

LifeVest she was wearing malfunctioned and 'exploded' causing her neck to acutely snap forward followed by an additional discharge resulting in a separate jolt."

91.

The defective and unreasonably dangerous condition of the LifeVest existed at the time the product left Zoll Medical Corporation's control.

92.

The LifeVest was not altered or modified after leaving Zoll Medical Corporation's control and before the March 5, 2025 incident.

93.

No intervening cause contributed to the LifeVest's malfunction.

94.

The LifeVest's unreasonably dangerous condition in construction or composition was a proximate cause of Norma Pellegrin's injuries and damages.

95.

The inappropriate discharge caused Norma Pellegrin's neck to snap forward violently, directly causing traumatic injury to her cervical spine.

96.

The traumatic injury resulted in acute exacerbation of cervical spine pathology, multilevel disc bulges and herniations, central canal stenosis, and foraminal stenosis.

97.

Norma Pellegrin's injuries were a direct and foreseeable result of the LifeVest's defective condition.

98.

The damage arose from a reasonably anticipated use of the LifeVest.

99.

Norma Pellegrin used the LifeVest as intended by Zoll Medical Corporation, as prescribed by her physician, and in a reasonably anticipated manner.

100.

Wearing the LifeVest while entering cardiac rehabilitation was a normal, expected, and reasonably anticipated use of the device.

101.

This claim is a parallel state law claim that does not impose requirements different from or in addition to federal requirements.

102.

This claim is based on the specific device's deviation from Zoll Medical Corporation's own manufacturing specifications and performance standards, not on any alleged inadequacy of federal requirements.

103.

This claim would exist even in the absence of federal regulation, as it is based on traditional state law duties not to manufacture defective products that deviate from the manufacturer's own specifications.

104.

As a direct and proximate result of the LifeVest's unreasonably dangerous condition in construction or composition, Norma Pellegrin has suffered and continues to suffer severe injuries and damages.

105.

Plaintiff Norma Pellegrin repeats and realleges the allegations set forth in paragraphs 1 through 104 as if fully set forth herein.

106.

Zoll Medical Corporation is a manufacturer of the LifeVest wearable cardioverter defibrillator.

107.

At the time the LifeVest left Zoll Medical Corporation's control, there existed an alternative design for the product that was capable of preventing or significantly reducing the risk of Norma Pellegrin's personal injury.

108.

Alternative designs existed that would have prevented or significantly reduced the risk of inappropriate discharge and resulting physical trauma during normal use.

109.

Specific alternative designs that would have prevented the inappropriate discharge, such as: improved arrhythmia detection algorithms with multiple verification steps before shock delivery; enhanced patient alert systems that provide longer warning periods and require patient confirmation before shock delivery; additional safeguards to prevent discharge in the absence of confirmed life-threatening arrhythmias; redundant sensor systems to verify arrhythmia detection; design features that reduce the physical force of discharge to minimize trauma; or automatic device shutdown mechanisms when malfunction is detected.

110.

The likelihood that the LifeVest's design would cause Norma Pellegrin's damage and the

gravity of that damage outweighed the burden on Zoll Medical Corporation of adopting such alternative design.

111.

The LifeVest's design created a substantial risk of inappropriate discharge during normal use.

112.

Inappropriate discharge of a cardioverter defibrillator causes severe physical trauma, including violent muscle contractions and forceful body movements that can result in serious injury.

113.

The gravity of potential injuries from inappropriate discharge, including cervical spine trauma, is severe and life-altering.

114.

Alternative designs that would reduce or eliminate the risk of inappropriate discharge were technically feasible and would not impose an unreasonable burden on Zoll Medical Corporation.

115.

Alternative designs would not have an adverse effect on the utility of the LifeVest in detecting and treating actual life-threatening arrhythmias.

116.

The LifeVest's design defect was a proximate cause of Norma Pellegrin's injuries and damages.

117.

The design defect allowed the device to deliver inappropriate shocks, which directly caused

Norma Pellegrin's cervical spine injuries.

118.

The damage arose from a reasonably anticipated use of the LifeVest.

119.

Norma Pellegrin used the LifeVest as intended, as prescribed, and in a reasonably anticipated manner.

120.

This claim is a parallel state law claim that does not impose requirements different from or in addition to federal requirements.

121.

This claim is based on the existence of alternative designs that would have prevented the malfunction while still complying with all applicable federal requirements.

122.

The alternative designs would not conflict with or add to federal requirements applicable to the LifeVest.

123.

As a direct and proximate result of the LifeVest's unreasonably dangerous design, Norma Pellegrin has suffered and continues to suffer severe injuries and damages.

124.

Plaintiff Norma Pellegrin repeats and realleges the allegations set forth in paragraphs 1 through 123 as if fully set forth herein.

125.

Zoll Medical Corporation is a manufacturer of the LifeVest wearable cardioverter

defibrillator.

126.

The LifeVest was unreasonably dangerous because an adequate warning about the product was not provided.

127.

Zoll Medical Corporation failed to provide adequate warnings to users and prescribing physicians regarding the risk of inappropriate discharge and resulting physical trauma.

128.

Specific warnings that were inadequate or missing, such as: warnings about the risk and frequency of inappropriate discharge; warnings about the severe physical trauma that can result from device malfunction, including cervical spine injury; warnings about the need for additional monitoring or safeguards during use; warnings about specific circumstances or activities that increase the risk of malfunction; warnings about the violent physical force of discharge and the need to be in a safe position when discharge occurs; or instructions on how to minimize injury risk during use.

129.

The inadequate warning existed at the time the LifeVest left Zoll Medical Corporation's control.

130.

Zoll Medical Corporation knew or should have known of the risk of inappropriate discharge and resulting physical trauma.

131.

An adequate warning would have led Norma Pellegrin and her prescribing physicians to

contemplate the danger of inappropriate discharge and resulting cervical spine trauma.

132.

An adequate warning would have led Norma Pellegrin and her prescribing physicians to either decline to use the LifeVest or to use it in a manner that would have avoided the damage.

133.

Had Norma Pellegrin and her physicians been adequately warned of the risk of inappropriate discharge and resulting physical trauma, they would have taken additional precautions, selected alternative therapy, or used the device in a manner that would have prevented the March 5, 2025 incident.

134.

The inadequate warning was a proximate cause of Norma Pellegrin's injuries and damages.

135.

Adequate warnings would have led to different treatment decisions or additional safeguards that would have prevented Norma Pellegrin's injuries.

136.

This claim is a parallel state law claim that does not impose requirements different from or in addition to federal requirements.

137.

This claim is based on Zoll Medical Corporation's failure to provide warnings required by federal law or warnings about risks not adequately addressed in FDA-approved labeling.

138.

As a direct and proximate result of Zoll Medical Corporation's failure to provide adequate warnings, Norma Pellegrin has suffered and continues to suffer severe injuries and damages.

139.

Plaintiff Norma Pellegrin repeats and realleges the allegations set forth in paragraphs 1 through 138 as if fully set forth herein.

140.

Zoll Medical Corporation is a manufacturer of the LifeVest wearable cardioverter defibrillator.

141.

Zoll Medical Corporation made express warranties about the LifeVest.

142.

Specific express warranties made by Zoll Medical Corporation include warranties that the device would only deliver shocks when life-threatening arrhythmias are detected; warranties that the device would function safely during normal use; warranties that the device meets certain performance and safety standards; or warranties regarding the device's reliability and accuracy in detecting arrhythmias.

143.

The LifeVest did not conform to Zoll Medical Corporation's express warranties.

144.

The LifeVest malfunctioned and delivered inappropriate shocks when no life-threatening arrhythmia was present, contrary to its intended function and Zoll Medical Corporation's express representations.

145.

A properly functioning LifeVest conforming to Zoll Medical Corporation's express warranties would only deliver shocks when life-threatening arrhythmias are detected.

146.

The LifeVest's delivery of inappropriate shocks demonstrates that it failed to conform to Zoll Medical Corporation's express warranties regarding the device's safety, performance, and reliability.

147.

Zoll Medical Corporation's express warranties induced Norma Pellegrin and her prescribing physicians to use the LifeVest.

148.

Norma Pellegrin and her physicians relied on Zoll Medical Corporation's express warranties in deciding to use the LifeVest as part of her cardiac care.

149.

Norma Pellegrin would not have used the LifeVest, or her physicians would not have prescribed the LifeVest, but for Zoll Medical Corporation's express warranties regarding the device's safety and performance.

150.

Norma Pellegrin's damage was proximately caused because the express warranty was untrue.

151.

The LifeVest's failure to conform to Zoll Medical Corporation's express warranties directly caused the inappropriate discharge on March 5, 2025.

152.

The inappropriate discharge directly caused Norma Pellegrin's cervical spine injuries.

153.

This claim is based on Zoll Medical Corporation's own representations about the product, not on federal requirements.

154.

This claim does not impose requirements different from or in addition to federal requirements.

155.

As a direct and proximate result of the LifeVest's nonconformity to Zoll Medical Corporation's express warranties, Norma Pellegrin has suffered and continues to suffer severe injuries and damages.

156.

Plaintiff Mark Pellegrin repeats and realleges the allegations set forth in paragraphs 1 through 155 as if fully set forth herein.

157.

Mark Pellegrin is the husband of Norma Pellegrin.

158.

Norma Pellegrin suffered severe injuries due to the fault of Zoll Medical Corporation.

159.

As alleged, Zoll Medical Corporation is liable to Norma Pellegrin for manufacturing, designing, and distributing a defective LifeVest that caused her injuries.

160.

As a result of the injuries to Norma Pellegrin, Mark Pellegrin has suffered and continues to suffer loss of consortium.

161.

Mark Pellegrin has lost the companionship, love, and affection of his wife.

162.

Mark Pellegrin has lost the services and society of his wife.

163.

Norma Pellegrin's injuries have substantially impaired her ability to participate in activities and aspects of married life that she and Mark Pellegrin previously enjoyed together.

164.

Norma Pellegrin's ongoing pain, medical treatment, and functional limitations have significantly affected her relationship with Mark Pellegrin.

165.

Mark Pellegrin's relationship with Norma Pellegrin has been affected by her injuries due to her inability to participate in recreational, social, or family activities they previously enjoyed together; changes in their daily life and household routines; the impact of her chronic pain and ongoing medical treatment on their relationship and quality of life; caregiving responsibilities

166.

Mark Pellegrin's loss of consortium is a direct and proximate result of Zoll Medical Corporation's liability to Norma Pellegrin.

167.

As a direct and proximate result of Zoll Medical Corporation's conduct, Mark Pellegrin has suffered and continues to suffer loss of consortium damages.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant Zoll Medical Corporation as follows:

1.      Damages against Zoll Medical Corporation in favor of Norma Pellegrin for past medical expenses incurred, including emergency room treatment, physician consultations, diagnostic imaging, cervical epidural steroid injection, and related medical care.

2.      Damages against Zoll Medical Corporation in favor of Norma Pellegrin for future medical expenses reasonably certain to be incurred for ongoing treatment of her cervical spine injuries.

3.      Damages against Zoll Medical Corporation in favor of Norma Pellegrin for past physical pain and suffering.

4.      Damages against Zoll Medical Corporation in favor of Norma Pellegrin for future physical pain and suffering reasonably certain to be endured.

5.      Damages against Zoll Medical Corporation in favor of Norma Pellegrin for mental anguish and emotional distress.

6.      Damages against Zoll Medical Corporation in favor of Norma Pellegrin for loss of enjoyment of life and diminished quality of life.

7.      Damages against Zoll Medical Corporation in favor of Mark Pellegrin for loss of consortium, including loss of companionship, love, affection, services, and society.

8.      Pre-judgment interest as allowed by law.

9.      Post-judgment interest as allowed by law.

10.     Costs of this proceeding.

11.     Such other and further relief as the Court deems just and proper.


**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.


*Plaintiffs' Amended Complaint for Damages – Exhibit "A"*

Respectfully submitted,

GERALD F. ARCENEAUX, APLC

*/s/ Gerald F. Arceneaux*

_____

GERALD F. ARCENEAUX (#28866)
Post Office Box 848
Bourg, LA 70343-0848
Telephone: (985) 594-4199
Facsimile: (985) 594-1212
Email: geraldarceneaux@outlook.com

*Counsel for Plaintiffs,*
*Norma and Mark Pellegrin*

## <u>CERTIFICATION</u>

I hereby certify that on this 12th day of June 2026, a copy of the foregoing pleadings was served on all parties of record electronically via the Court's ECF system.

*/s/ Gerald F. Arceneaux*

_____

Gerald F. Arceneaux