**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| NORMA PELLEGRIN AND MARK PELLEGRIN, | Civil Action No. 2:26-cv-00830 |
| Plaintiffs, | Judge Lance M. Africk |
| vs. | Magistrate Judge Janis van Meerveld |
| ZOLL MEDICAL CORPORATION, | |
| Defendant. | |

**DEFENDANT ZOLL MEDICAL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Defendant ZOLL Medical Corporation ("ZOLL") requests this Court enter an order granting Defendant's Motion to Dismiss Plaintiffs Norma Pellegrin and Mark Pellegrin's Amended Complaint pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6).

**INTRODUCTION**

ZOLL's LifeVest® wearable cardioverter defibrillator is an FDA PMA-approved Class III medical device. The device is prescribed by healthcare professionals to patients who are at risk of sudden cardiac death ("SCD"). It monitors a patient's heart rhythm and, when it detects a life-threatening rapid arrhythmia—ventricular tachycardia (VT) or ventricular fibrillation (VF), delivers an electrical shock to restore normal rhythm, if indicated. Because the device's detection algorithm may identify a rhythm as potentially life-threatening even when the patient is conscious and not in actual distress, the FDA approved ZOLL's design that included a series of tactile and audible alarms and a response button mechanism: if the patient is conscious during the alarm sequence, the patient presses the response buttons to cancel the alarm sequence and impending shock. The FDA reviewed this design—including the detection algorithm, the alarm sequence, and the response button cancellation function—through the most rigorous regulatory pathway

available for medical devices: Premarket Approval ("PMA"). The FDA evaluated the known risk that a conscious patient who fails to press the response buttons may receive an unintended treatment shock, weighed that risk against the device's life-saving benefits, and granted Premarket Approval to LifeVest. Indeed, "inappropriate shock" is expressly identified as a known potential adverse event of the device. The FDA approved the LifeVest because it determined that the device, as designed, provided a reasonable assurance of safety and effectiveness in the prevention of sudden cardiac death by VT or VF notwithstanding the potential of any inappropriate shock.

That is what happened here. On March 5, 2025, the LifeVest device worn by Mrs. Pellegrin detected what it interpreted as a treatable arrhythmia and, following its FDA-approved alarm sequence and Mrs. Pellegrin's failure to press the response buttons, delivered two treatment shocks. Plaintiffs allege that Ms. Pellegrin was not actually experiencing a life-threatening arrhythmia at the time and that the shocks were therefore "inappropriate." But an unintended shock to a conscious patient who does not press the response buttons is not a malfunction; it is a known, documented risk that the device's FDA-approved design anticipates, addresses, and also accepts because it is outweighed by the life-saving benefits of a treatment by the device. Plaintiffs are not alleging that the subject LifeVest did something it was not designed or approved to do. They are alleging that it did exactly what it was designed and approved to do — detected a rhythm, issued warnings, and delivered treatment — and that the outcome was harmful. That is a challenge to the adequacy of the FDA-approved design itself, and precisely the type of claim federal law preempts.

After ZOLL moved to dismiss the original Petition on preemption grounds [Doc. 8], Plaintiffs filed an Amended Complaint that attempts to plead around preemption. But the amendments do not cure–they confirm–the fundamental problem. Specifically, Plaintiffs added a section titled "Federal Preemption Allegations" in which they incorrectly allege, "upon

information and belief," that the LifeVest received marketing authorization through the 510(k) premarket notification process. That allegation is demonstrably false, which is appropriate for the Court to recognize in the context of this Rule 12(b) motion to dismiss. LifeVest received full PMA, not 510(k) clearance, as confirmed by the FDA's PMA approval letter already in this Court's record. The distinction matters: PMA devices receive the full benefit of express preemption under *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008), because the rigorous PMA process imposes device-specific federal requirements on every aspect of the device's design, manufacturing, and labeling. By mischaracterizing the regulatory pathway, Plaintiffs seek to invoke the lesser preemptive framework but that strategy fails on the undisputed facts.

More fundamentally, Plaintiffs' Amended Complaint reveals on its face that their claims are not "parallel" in any sense. A parallel state law claim survives preemption only if it is premised on the violation of a specific federal requirement. Plaintiffs must identify the requirement and allege how the manufacturer violated it. Plaintiffs have done none of that. Instead, they have pursued two strategies, both of which fail.

First, they treat the occurrence of the unintended treatment shock as self-proving evidence of a manufacturing defect — the device shocked Ms. Pellegrin when she was not in arrhythmia, so the device must have deviated from its specifications. But that reasoning collapses under scrutiny because the FDA approved a device that it knew would, on occasion, deliver shocks to conscious patients not in arrhythmia if they failed to press the response buttons. The detection algorithm is not infallible, and the FDA never required it to be. The FDA's solution was the response buttons, not a guarantee of zero false detections. Inferring a manufacturing deviation from a known and anticipated outcome is not a parallel claim.

3

Second, Plaintiffs have layered conclusory "parallel claim" labels onto every count, asserting that each claim "does not impose requirements different from or in addition to federal requirements." But examining the substance of each claim reveals that every one of them would, if successful, require ZOLL to have done something different from what the FDA approved:

- Their manufacturing defect claim (Count I) alleges that a conforming LifeVest would never deliver a shock absent a confirmed life-threatening arrhythmia, but the FDA approved a device that it knew would occasionally do exactly that and required the response buttons as the safeguard. Holding ZOLL liable on this theory would impose a heightened zero-false-detection standard that the FDA did not require.
- Their design defect claim (Count II) proposes alternative detection algorithms, alternative alert systems, redundant sensors, reduced-force discharge mechanisms, and automatic shutdown features—every one of which targets a component of LifeVest's design the FDA specifically reviewed, tested, and approved through PMA. Requiring ZOLL to adopt different algorithms, different alerts, or different energy delivery parameters than the ones the FDA approved is the definition of imposing requirements "different from, or in addition to" federal requirements.
- Their failure to warn claim (Count III) alleges that ZOLL should have provided additional warnings about the risk of unintended shocks, but the FDA-approved labeling already warns that the patient may receive a shock while conscious if the response buttons are not pressed. Demanding additional or different warnings beyond what the FDA approved is expressly preempted under *Riegel*. 552 U.S. at 329.
- Their express warranty claim (Count IV) alleges that ZOLL warranted the device would "only deliver shocks when life-threatening arrhythmias are detected," but the FDA-approved labeling says the opposite, expressly warning of the possibility of an unintended shock when the patient's heart is beating normally and the patient is conscious and fails to press the response buttons. The alleged warranty does not exist in the FDA-approved materials, and Plaintiffs identify no other source for it.

Simply stating a claim is "parallel" is not the same as actually pleading one. Plaintiffs have not identified a single specific federal requirement that ZOLL violated. They have not alleged how the subject LifeVest deviated from any specific manufacturing process or specification. And they have not pleaded any claim that would not, if successful, impose upon ZOLL a requirement different from or in addition to the requirements the FDA imposed through PMA. All of Plaintiffs' claims are preempted–expressly under *Riegel* and impliedly under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).

Separate and apart from federal preemption, Plaintiffs' claims are insufficiently pleaded. The Amended Complaint's allegations are conclusory, facially implausible and must be dismissed. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

**FACTUAL BACKGROUND**

**A. The FDA exercises rigorous oversight of Class III PMA medical devices.**

The 1976 Medical Device Amendments ("MDA") to the FDCA created a comprehensive "regime of detailed federal oversight" for medical devices. *Riegel*, 552 U.S. at 316; *see* 21 U.S.C. § 360c. The MDA established three classes of medical devices based on use and level of potential risk. *Buckman*, 531 U.S. at 344. The FDA generally approves new medical devices through one of two channels: (1) substantial-equivalency approval (also called "510(k) clearance") or (2) premarket approval ("PMA"). *See generally* 21 U.S.C. §§ 360c(i), 360e(a) (governing 510(k) clearance and PMA respectively). Class III medical devices "'presen[t] a potential unreasonable risk of illness or injury' and therefore incur the FDA's strictest regulation." *Id.* (alteration in original; quoting 21 U.S.C. § 360c(a)(1)(C)(ii)(II)).

Because of the inherent risks involved in such life-sustaining devices, the PMA process is "exhaustive," *Buckman*, 531 U.S. at 349; "rigorous," *Riegel*, 552 U.S. at 317; and "run[s] the gauntlet," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 494 (1996). It involves "a time-consuming inquiry into the risks and efficacy of each device." *Buckman*, 531 U.S. at 348. The FDA reviews the manufacturer's detailed submissions regarding their devices, "spending an average of 1,200 hours on each submission." *Lohr*, 518 U.S. at 477. Ultimately, to gain PMA, the manufacturer must demonstrate that the device satisfies the statutory standard: a reasonable assurance of safety and effectiveness. *See* 21 U.S.C. §§ 360c(a)(1)(C), 360e(c); *see also Riegel v. Medtronic, Inc.*, 451 F.3d 104, 109 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008).

5

In scrutinizing PMA applications, the FDA "weigh[s] any probable benefit to health from the use of the device against any probable risk of injury or illness from such use." *Riegel*, 552 U.S. at 318 (quoting 21 U.S.C. § 360c(a)(2)(C)). If the FDA is not satisfied with the information provided, it can demand more. *See id*. (citing 21 U.S.C. § 360e(c)(1)(G)). It can also require a manufacturer to revise the device's design, manufacturing methods, or labeling. *See id*. at 319 (citing 21 C.F.R. § 814.44(e)). The FDA "grants premarket approval only if it finds there is a 'reasonable assurance' of the device's 'safety and effectiveness.'" *Id*. (quoting 21 U.S.C. § 360e(d)). But this reasonable assurance of safety and effectiveness is not a guarantee of complete safety. In fact, the FDA recognizes that they may "approve devices that present great risks if they nonetheless offer great benefits in light of available alternatives." *Riegel*, 552 U.S. at 318.

The FDA's regulatory role does not end with PMA approval. "Once a device has received premarket approval, the MDA forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." *Id.* at 319 (citing 21 U.S.C. § 360e(d)(6)(A)(i)). If a manufacturer wishes to make changes, it must submit a supplemental application for premarket approval and may implement the changes only after receiving FDA approval. *See id.* (citing 21 U.S.C. § 360e(d)(6); 21 C.F.R. § 814.39(c)).

The FDA has the authority to investigate violations of the FDCA and its amendments, and "has at its disposal a variety of enforcement options that allow it to make a measured response" to any problems that it discovers. *Buckman*, 531 U.S. at 349 (rejecting tort claims by private litigants based on allegations that a company fraudulently obtained FDA permission to market a device and holding that the federal government is exclusively authorized to bring actions under the FDCA and to police "fraud-on-the-FDA"). The MDA is not enforceable by private litigants; rather, any

6

actions to enforce FDA requirements as to a PMA device "shall be by and in the name of the United States." *Id.* at n. 4 (quoting 21 U.S.C. § 337(a)).

In sum, a PMA medical device does not reach the market unless the FDA, following an exhaustive and lengthy review, imposes requirements for all aspects of the device relating to safety and effectiveness—including its design, labeling, and patient training materials—and determines the device's overall risk/benefit profile is such that licensed healthcare professionals should have the option of prescribing it when they believe it may improve the health or save the life of a patient.

## B.  The LifeVest Device

LifeVest is a potentially lifesaving medical device approved by the FDA and prescribed by health care professionals to patients who are at a high risk of sudden cardiac death. (*See* M. Mims Decl. Exs. 1, 2 at 3;[1] *Croci v. ZOLL Medical Corp.*, No. 24-CV02137-NSR, 2025 WL 2307728, at *4 (S.D.N.Y. Aug. 11, 2025) (recognizing that the "LifeVest is a Class III medical device that has received PMA")). As relevant here, LifeVest includes an FDA-approved arrythmia monitoring functionality, designed to assess the likelihood that the wearer is experiencing a life-threatening, but treatable, rapid heart rhythm. If the device detects such an arrythmia—VT or VF, it issues a warning vibration followed by a siren so that if the wearer is conscious, he or she may press the response buttons to avoid an unintended treatment shock. (M. Mims Decl. Ex. 2 at pp. 3–4). Accordingly, the possibility that a conscious patient may receive an unintended treatment shock if the patient does not press the response buttons is a known characteristic of LifeVest's FDA-

---

[1] Exhibits 1 to 4 of the Declaration of Michael Mims are public records available on the FDA's website. The Court may take judicial notice of public records in deciding a motion to dismiss, and this does not convert the motion to dismiss to a motion for summary judgment. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (finding that the district court appropriately used judicial notice to take notice of publicly available documents from the FDA, including a grant of PMA, and appropriately treated the motion as a Rule 12(b) motion to dismiss). Judges in this district have previously found that Premarket Approval and other device-related documents published by the FDA are appropriately subject to judicial notice. *See, e.g.*, *Celino v. Biotronik, Inc.*, 536 F. Supp. 3d 89, 101 (E.D. La. 2021); *Scianneaux v. St. Jude Medical, S.C., Inc.*, 961 F. Supp. 2d 808, 812 (E.D. La. 2013); *Doucet v. Abbot Laboratories, Inc.*, Slip Copy, No. 25-405, 2025 WL 1548534, at *7 (E.D. La. May 29, 2025).

approved design, not a defect.

As the FDA's Summary of Safety and Effectiveness Data explains, "[w]hen the device detects an arrhythmia, it also instructs the patient to stop the impending shock by pressing the response buttons to avoid receiving a shock while conscious because of the pain associated with the shock." (*Id.* p. 5). The response button mechanism exists because the FDA and ZOLL recognized, as part of the PMA process, that the detection algorithm may identify a rhythm as potentially life-threatening, *e.g.*, a cardiac rhythm artifact or noise, even when the patient is conscious and not in actual distress. Thus, the device's design, labeling, and instructions for use direct the conscious patient to cancel the treatment by pressing the response buttons.

The FDA's approved list of "Potential Adverse Events" for LifeVest expressly identifies "[i]nappropriate shock" as a known potential adverse event. (*Id.* p. 8). What Plaintiffs characterize as a "malfunction" and a "defect" is in fact a known, documented, and FDA-reviewed risk of the device's approved design—one the FDA weighed and accepted in granting PMA.

Because LifeVest is used "in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," 21 U.S.C. § 360c(a)(1)(A)(ii)(II), it is a Class III medical device—the highest class. The FDA approved LifeVest's design, labeling, and patient training materials through the more complex, lengthy, and scientifically robust PMA process, on December 18, 2001, and subsequent Premarket Approval Supplements. (M. Mims Decl. Exs. 1, 4). Likewise, the FDA approved the LifeVest device's detection algorithm, alarm and warning sequence, response button cancellation mechanism, and patient instructions for use, with full knowledge of the risk of unintended shocks.

Plaintiffs' Amended Complaint incorrectly alleges, "upon information and belief," that LifeVest "received marketing authorization through the FDA's 510(k) premarket notification

8

process." (Am. Compl. ¶ 68). This allegation is contradicted by public FDA records already submitted to this Court. The PMA approval letter for LifeVest, PMA No. P010030, dated December 18, 2001, is attached as Exhibit 1 to the Declaration of Michael Mims (Doc. 8-3). The FDA's online PMA database likewise confirms full PMA, not 510(k) clearance. (Doc. 8-6). Courts in this district have held that the Court may take judicial notice of such public FDA records on a motion to dismiss, and this does not convert the motion to dismiss to a motion for summary judgment. *See Funk*, 631 F.3d at 783; *Celino v. Biotronik, Inc.*, 536 F. Supp. 3d 89, 101 (E.D. La. 2021). Because Plaintiffs' "upon information and belief" allegation regarding LifeVest's regulatory pathway is conclusively contradicted by judicially noticeable public records, and the Court can and should disregard this allegation. *See Croci*, No. 2025 WL 2307728 at *4 (recognizing that the "LifeVest is a Class III medical device that has received PMA").

### C. Norma Pellegrin's LifeVest

Ms. Pellegrin had a history of cardiac disease including "non-ST elevation myocardial infraction with heart failure." (Am. Compl. ¶ 12). As part of recovery from her heart attack, Ms. Pellegrin was prescribed a LifeVest by one of her healthcare providers. (*Id*. ¶ 14). Ms. Pellegrin claims that she began using the subject LifeVest, and on March 5, 2025, the subject LifeVest administered two "inappropriate" treatments. (*Id*. ¶¶ 21–25). Ms. Pellegrin claims her neck snapped forward, causing pain to her neck and spine. (*Id*.) She sought treatment at Thibodaux Regional Health System that same day. (*Id*. ¶ 27).

The Amended Complaint adds extensive detail regarding Ms. Pellegrin's post-incident medical treatment, including an MRI showing multilevel cervical pathology on April 25, 2025, evaluation by a spine specialist on June 17, 2025, and treatment with a cervical epidural steroid injection on July 7, 2025. (*Id.* ¶¶ 34, 39, 44). While these additions elaborate on Ms. Pellegrin's

9

alleged injuries, they do not remedy the original or Amended Complaint's fundamental legal deficiencies regarding preemption and pleading sufficiency. The core allegation remains unchanged: that the subject LifeVest delivered unnecessary treatment shocks because Ms. Pellegrin was allegedly not experiencing a life-threatening arrhythmia and failed to press the response buttons while conscious. But that is precisely the type of event that the device's FDA-approved design anticipates and addresses.

### D. Plaintiffs' Amended Claims

Plaintiffs' Amended Complaint retains the same four LPLA causes of action from the original Petition: unreasonably dangerous in construction or composition (Count I), unreasonably dangerous in design (Count II), unreasonably dangerous because of inadequate warning (Count III), and unreasonably dangerous because of nonconformity to express warranty (Count IV), and adds a standalone loss of consortium count (Count V).

In an effort to avoid preemption, Plaintiffs have added to each count boilerplate assertions that the claim "is a parallel state law claim that does not impose requirements different from or in addition to federal requirements." (*See, e.g.,* Am. Compl. ¶ 101). Plaintiffs have also added a section titled "Federal Preemption Allegations" in which they incorrectly allege that LifeVest received 510(k) clearance rather than PMA and that their claims are therefore "parallel" claims. (Am. Compl. ¶¶ 68, 72).

But simply labeling a claim as "parallel" does not make it so. *See Funk*, 631 F.3d at 782; *Naquin v. Medtronic, Inc.*, No. 20-2401, 2020 WL 7060150, at *6 (E.D. La. Dec. 2, 2020) (it is not enough to "simply incant the magic words '[the manufacturer] violated FDA regulations' in order to avoid preemption"). And Plaintiffs' central factual allegation that the subject LifeVest delivered treatment shocks when Ms. Pellegrin was not experiencing a life-threatening arrhythmia describes

10

a known, FDA-reviewed, and FDA-accepted risk of the device, not a manufacturing defect or design flaw. All of these claims are preempted and fail as a matter of law.

## LEGAL STANDARD

Dismissal should be granted when a complaint fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). A complaint must plead enough facts to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Courts will not credit conclusory allegations because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A plaintiff must do more than raise "a sheer possibility that [the] defendant has acted unlawfully." *Id*.

Dismissal is also appropriate when it is apparent from the complaint and any documents subject to judicial notice that the plaintiff's claims are barred by federal preemption as a matter of law. *See Funk*, 631 F.3d at 777; *see also Celino*, 536 F. Supp. 3d at 101–05 (dismissing plaintiff's LPLA claim of unreasonably dangerous in construction or composition claim on preemption grounds). A complaint that fails to adequately plead claims that survive preemption should be dismissed. *Funk,* 631 F.3d at 782.

Courts in this circuit have held that, in the context of MDA preemption, dismissing a complaint is proper where a plaintiff fails to "allege a state-law claim which is genuinely equivalent to a federal requirement, *i.e.*, one which is premised upon the violation of a federal requirement." *Lemelle v. Stryker Orthopaedics*, 698 F. Supp. 2d 668, 678 (W.D. La. 2010). "Where

a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Naquin*, No. 20-2401, 2020 WL 7060150, at *3 (quoting *Iqbal*, 556 U.S. at 678). Nor is plaintiff's characterization of its own claims as "parallel" entitled to deference. Courts must examine the actual substance of the allegations, not the labels plaintiffs apply to them. *See Reddick v. Medtronic, Inc.*, No 21-30169, 2022 WL 715494, at *3 (5th Cir. Mar. 9, 2022) ("Even if a state law claim is parallel, a district court may still dismiss if it if the claim is impermissibly conclusory and vague.") (internal quotation omitted).

## ARGUMENT

### A. Plaintiffs' claims are preempted by federal law.

The preemption doctrine is derived from the Supremacy Clause of the United States Constitution, which provides that the "[l]aws of the United States … shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. A federal law preempts state law in any of three circumstances: (1) "a federal statute may expressly preempt the state law"; (2) "a federal law may impliedly preempt a state law"; or (3) "preemption results from an actual conflict between a federal and a state law." *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 965 (6th Cir. 2004); *see also U.S. v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016). The central inquiry in any preemption analysis is to determine the intent of Congress. *See Lohr*, 518 U.S. at 471 (citation omitted).

The MDA, which as discussed above requires rigorous review and approval of Class III medical devices like LifeVest, preempts state-law product liability and negligence claims challenging Class III medical devices' safety. Thus, 21 U.S.C. § 360k(a) prohibits states from imposing "any requirement" relating to the safety or effectiveness of a medical device that "is different from, or in addition to, any requirement applicable … to the device" under federal law.

*See Riegel*, 552 U.S. at 321–22.[2] Consequently, "nearly all types of claims concerning FDA-approved medical devices are preempted." *In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*, 592 F. Supp. 2d 1147, 1161 (D. Minn. 2009), *aff'd*, 623 F.3d 1200 (8th Cir. 2010).

Two forms of federal preemption arise in this case and bar Plaintiffs' claims. First, ***express preemption*** arises because Plaintiffs' claims attempt to impose requirements "different from, or in addition to," federal requirements governing the safety or efficacy of LifeVest. *See* 21 U.S.C. § 360k (expressly preempting state law requirements for safety and efficacy).[3] Second, ***implied conflict preemption*** arises from Plaintiffs' attempt to enforce FDA medical device requirements that are the exclusive domain of the federal government. *See* 21 U.S.C. § 337(a) (providing that FDA enforcement proceedings "shall be by and in the name of the United States").

Together, express and implied preemption require a plaintiff's state law claim to fit through a "narrow gap" to survive dismissal. *Celino*, 536 F. Supp. 3d at 100. A plaintiff must be suing "'for conduct that *violates* the FDCA (or else his claim is expressly preempted by § 360k(a)), but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman*).'" *In re Medtronic, Inc., Sprint Fidelis Leads Prod. Liab. Litig.*, 623 F.3d 1200, 1204 (8th Cir. 2010). Additionally, the duties imposed by the state and federal requirements must be "genuinely equivalent" if not "identical." *Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1300 (11th Cir. 2011) (genuinely equivalent); *Wisher v. Medtronic, Inc.*, 616 F. App'x 433, 434 (2d Cir. 2015) (identical); *see Lemelle*, 698 F. Supp. 2d at 678 (W.D. La.

---

[2] The Supreme Court's recent decision in *Monsanto Co. v. Durnell*, 609 U.S. ___, 2026 WL 1825691 (U.S. June 25, 2026), confirms the breadth of this preemption clause. The Court held that FIFRA's express preemption provision — which uses language "materially identical" to § 360k(a) — preempts state tort claims that would impose labeling or design requirements "in addition to or different from" those mandated by federal law. *Id.* at *3, *10. The Court also held that *Riegel* "further confirms" this result, viewing FDA premarket approval of medical devices as directly analogous to EPA product registration. *Id.* at *9. *Durnell*'s reasoning applies with equal force here, where the FDA has imposed device-specific requirements on every aspect of the LifeVest through the PMA process.

[3] Express preemption applies not only to requirements imposed by state legislative enactments but also by state common law tort duties. *See Riegel*, 552 U.S. at 323–24.

13

2010) ("in order to avoid express preemption, [a plaintiff] must allege a state-law claim which is genuinely equivalent to a federal requirement, i.e., one which is premised upon the violation of a federal requirement."); *Gavin v. Medtronic, Inc.*, No. 12-0851, 2013 WL 3791612, at *17 (E.D. La. July 19, 2013) (dismissing causes of action on the grounds of preemption and providing that plaintiff failed "to identify the traditional state law duties that are 'parallel' 'or genuinely equivalent'" to the FDA requirements).

To plead a parallel claim that fits through this narrow gap, a plaintiff must allege the defendant violated a particular federal specification applicable to the device at issue. *See Funk*, 631 F.3d at 782 (upholding dismissal where complaint failed to identify how a Class III device deviated from the FDA approved manufacturing process). It is not enough for the plaintiff to "'simply incant the magic words '[the manufacturer] violated FDA regulations' in order to avoid preemption.'" *Naquin*, 2020 WL 7060150, at *6 (citing *In re Medtronic, Inc., Sprint Fidelis Leads Prod. Liab. Litig.*, 529 F.Supp.2d 1147, 1158 (D. Minn. 2009)). Here, Plaintiffs' claims are both expressly preempted and impliedly preempted. Under either doctrine, they must be dismissed.

### B. Plaintiffs' claims are expressly preempted.

In *Riegel*, the Supreme Court established a two-part test for determining whether state law claims involving a Class III medical device are expressly preempted. First, the court must determine whether "the Federal Government has established requirements applicable to" the device. *Riegel*, 552 U.S. at 321. Second, if the Federal Government has established applicable requirements, the court must determine whether a plaintiff's state law claims would impose "requirements with respect to the device that are 'different from, or in addition to' the federal ones, and that related to safety and effectiveness." *Id.* at 321–22 (quoting 21 U.S.C. § 360k(a)); *see*

14

*Gavin*, No. 12-0851, 2013 WL 3791612 (applying two-step *Riegel* express preemption test).[4]

### 1. LifeVest is a PMA Class III medical device under federal law.

As a Class III device that was subject to the PMA process, LifeVest easily meets the first part of the *Riegel* test. Indeed, *Riegel* established that premarket approval of a medical device imposes federal requirements applicable to the device as a matter of law. *See* 552 U.S. at 322; *see also Lemelle*, 698 F. Supp. 2d at 674 ("As a practical matter, any device that has been approved by the PMA process will satisfy the first prong of the *Riegel* preemption analysis. . .").

Plaintiffs' Amended Complaint incorrectly alleges, "upon information and belief," that LifeVest "received marketing authorization through the FDA's 510(k) premarket notification process." (Am. Compl. ¶ 68). This is flatly wrong and contradicted by the public record. LifeVest received full PMA, not 510(k) clearance. The FDA's PMA approval letter, PMA No. P010030, dated December 18, 2001, is attached as Exhibit 1 to the Mims Declaration (Doc. 8-3) and is a

---

[4] Following *Riegel*, courts in the Fifth Circuit have regularly rejected state law claims on preemption grounds. *See Rodriguez v. Am. Med. Sys., Inc.*, 597 Fed. Appx. 226, 229 (5th Cir. 2014) (affirming district court's dismissal of complaint involving Class III medical device on preemption grounds); *Greene v. Nevro Corp.*, No. 23-CV-1648-JWD-RLB, 2025 WL 369682, at *7 (M.D. La. Jan. 31, 2025) (dismissing plaintiff's LPLA claims involving Class III medical device on preemption grounds); *Reddick*, 2022 WL 715494 at *3 (affirming dismissal of defective construction, defective design, failure to warn, and breach of express warranty claims involving a Class III device under the LPLA because all four claims imposed requirements that relate to the safety and effectiveness of the device).

Courts have likewise consistently applied *Riegel* to dismiss claims involving LifeVests:
In *Dossie Minor v. ZOLL Medical Corporation*, the court found that state-law tort claims challenging the design, warnings, and functionality of the LifeVest were expressly preempted under § 360k(a), because the LifeVest's PMA status meant that the FDA had already reviewed and approved the specific device characteristics at issue, and the plaintiff's claims would have imposed state-law requirements different from or in addition to those federal requirements. (M. Mims Decl. Ex. 5).
Similarly, in the decision in *Smith v. ZOLL Med. Corp.*, No. 120CV02204STAJAY, 2021 WL 5763565 (W.D. Tenn. Dec. 3, 2021) the court applied the *Riegel* preemption framework to LifeVest-related claims and concluded that the plaintiff's causes of action should be dismissed for failure to offer competent and admissible expert testimony establishing that the LifeVest® was unreasonably dangerous at the time it left ZOLL's hands due to an identifiable manufacturing defect caused by a violation of an identifiable federal regulation in keeping with *Riegel v. Medtronic, Inc.*, 552 U.S. 312 (2008).
The court in *Siordia v. Zoll Medical Corp.*, No. 22STCV12268, 2022 WL 16756576 (Cal. Super. Oct. 03, 2022) likewise held that claims arising from the use of a PMA-approved device such as the LifeVest are subject to express preemption under the MDA, further reinforcing the well-established principle that state tort claims cannot be used as a vehicle to challenge the safety or design of a device that the FDA has specifically approved.

public record of which the Court may take judicial notice without converting this Rule 12 motion to a Rule 56 motion for summary judgment. The FDA has since separately reviewed and approved over 199 PMA Supplements for the device. (Doc. 8-6).

**2. <u>Plaintiffs' claims would impose requirements different than or in addition to the FDA requirements for LifeVest.</u>**

The factual allegations in this case also satisfy the second part of the *Riegel* test. The facts alleged in the Amended Complaint, scant as they are, demonstrate that Plaintiffs' claims challenge the FDA's approval of LifeVest and seek to impose additional or different requirements than those detailed requirements imposed by the FDA when it granted PMA to LifeVest.

***Manufacturing Defect (Count I).*** Plaintiffs fail to adequately plead a parallel manufacturing defect claim. A manufacturing defect claim, like any other state-law claim, is *expressly* preempted if it imposes a requirement that is different from, or in addition to, the federal requirements applicable to the device, and/or is *impliedly* preempted if it seeks to enforce federal requirements under the guise of state law. Indeed, as a broad rule, "allegations of strict products liability based on manufacturing defect … are precisely the type of claims the MDA sought to preempt." *Williams v. Cyberonics, Inc.*, 388 F. App'x 169, 171 (3d Cir. 2010). Moreover, without specific allegations of fact about the alleged violation of federal requirements in the process of manufacturing the subject device, a federal PMA manufacturing violation cannot just be presumed. *See Walker v. Medtronic, Inc.*, 670 F.3d 569, 580–81 (4th Cir. 2012). In other words, an injury without violation of a federal requirement, does not evade preemption. Manufacturing defect claims are preempted unless the plaintiff specifies both "how the manufacturing process failed" and sets forth "a causal connection between the failure of the specific manufacturing process and the specific defect in the process that caused the personal injury." *Funk*, 631 F.3d at 782.

The Amended Complaint attempts to cure the deficiencies of the original Petition by adding

16

allegations that the subject LifeVest "deviated in a material way from [ZOLL's] own specifications and performance standards" because "a properly functioning LifeVest manufactured in accordance with [ZOLL's] specifications and performance standards would not have delivered shocks to Norma Pellegrin on March 5, 2025." (Am. Compl. ¶¶ 85, 64). But these allegations are fatally deficient for several reasons:

First, Plaintiffs do not identify any specific ZOLL manufacturing specification or performance standard from which the subject LifeVest allegedly deviated. They allege only the conclusion–deviation from "specifications"–without identifying what those specifications are or how the device departed from them.

Second, Plaintiffs do not identify any specific manufacturing process that failed or how any such failure caused the alleged defect. *See Rodriguez*, 597 Fed. Appx. at 230 (holding that plaintiff failed to plead a non-preempted manufacturing defect claim where he failed to identify "any deviation from the FDA-approved … manufacturing processes" and a nexus to plaintiff's alleged injury).

Third, Plaintiffs do not identify any specific federal requirement that ZOLL allegedly violated. A "parallel" manufacturing defect claim must be premised on the violation of a specific federal requirement. *See Lemelle*, 698 F. Supp. 2d at 678.

Fourth, and critically, Plaintiffs' entire theory of manufacturing defect rests on the false premise that the delivery of treatment shocks when the patient was not experiencing a life-threatening arrhythmia proves that the subject LifeVest deviated from its specifications. But unintended treatment shocks are a *known and FDA-reviewed characteristic* of LifeVest's approved design. The device's arrhythmia detection algorithm may declare an arrhythmia to exist based on signals it receives; if the patient is conscious and not actually in distress, the device provides a

17

vibration and an audible alarm sequence, and the patient is instructed to press the response buttons to cancel the treatment. The occurrence of a treatment shock to a conscious patient who does not press the response buttons is not per se evidence that the device deviated from its manufacturing specifications. Rather, it merely establishes that the device's FDA-approved safeguard against unintended shocks (the response buttons) was not utilized.

Plaintiffs cite medical records describing the event as involving a "defective lifevest" and "inappropriate life vest discharge." (Am. Compl. ¶ 89). But a treating physician's lay description of what happened recorded in the course of medical treatment is not a qualified assessment of whether the device deviated from its FDA-approved manufacturing specifications. A doctor's notes that the device "malfunctioned" or was "defective" are simply the physician's characterization of an unexpected outcome, not evidence of a manufacturing deviation from federal requirements. To hold otherwise would allow a plaintiff to plead around preemption any time a treating physician describes a known adverse event in colloquial terms. That is not the law. *See Funk*, 631 F.3d at 782; *Walker*, 670 F.3d at 580–81 (holding that an allegation that the device malfunctioned, without more, is insufficient to plead a parallel manufacturing defect claim).

***Design Defect (Count II).*** Plaintiffs' design defect claim is likewise preempted. La. R.S. § 9:2800.56 provides that a product is unreasonably dangerous in design if an alternative design exists capable of preventing the alleged damage and "[t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." La. R.S. § 9:2800.56. But PMA devices have already undergone the FDA's risk-benefits analysis. *Riegel*, 552 U.S. at 318; *see Doucet*, 2025 WL 1548534 at *6 (citing *Riegel*, 552 U.S. at 318) ("In analyzing PMA applications, the FDA balances

18

'any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.'").

The Amended Complaint adds a list of "alternative designs" including "improved arrhythmia detection algorithms with multiple verification steps before shock delivery," "enhanced patient alert systems," "redundant sensor systems," "design features that reduce the physical force of discharge," and "automatic device shutdown mechanisms when malfunction is detected." (Am. Compl. ¶ 109).

But these purported "alternative designs" go directly to elements of LifeVest's design that were expressly reviewed and approved by the FDA through the PMA process: the arrhythmia detection algorithm, the alarm and warning sequence, the response button mechanism, and the energy delivery system.

Plaintiffs' proposed alternative designs would require ZOLL to have used *different* detection algorithms, warning systems, and energy delivery systems than the ones the FDA reviewed and approved. That is the very definition of a claim seeking to impose requirements "different from, or in addition to" federal requirements. *See Riegel*, 552 U.S. at 321; *Hinkel v. St. Jude Medical, S.C.*, 869 F. Supp. 2d 739, 748 (E.D. La. 2012) (to maintain a defective design claim the plaintiff "would have to prove that an alternative design existed and that [the manufacturer's] choice not to adopt this alternative design was unreasonable under the circumstances."); *see also Reddick*, 2022 WL 715494, at *3 (affirming dismissal of a defective design claim under the LPLA because the claim would impose requirements that relate to the safety and effectiveness of the device). Plaintiffs' design defect claim must be dismissed as a matter of law.

***Failure to Warn (Count III).*** Plaintiffs' failure to warn claim brought under La. R.S. § 9:2800.57 is also preempted. The Amended Complaint adds a list of "specific warnings that were

19

inadequate or missing," including warnings about the risk and frequency of inappropriate discharge, the severe physical trauma that can result, and the need for additional monitoring. (Am. Compl. ¶ 128). But LifeVest's FDA-approved labeling and Instructions for Use ("IFU") *already warn* about the risk of unintended treatment shocks. The Patient Manual, approved by the FDA through PMA Supplement 56 and attached as Exhibit 3 to the Mims Declaration, warns:

> Press and hold both response buttons on the Alarm Module at the same time if you hear alarms, feel a vibration, and receive a message telling you to 'Respond.' If you do not, you may receive a defibrillating electrical shock while conscious. (Ex. 3, p. 13).

> If you receive a treatment while your heart is beating normally and you did not use the response buttons, the treatment may cause an abnormal rhythm to occur. (*Id.*)

> Certain environments or situations you encounter that are loud and have high vibration could affect the LifeVest ... A high vibration environment may result in an inappropriate treatment. (*Id.*, p. 14).

These warnings were reviewed and approved by the FDA as part of the PMA process. Plaintiffs' claim that ZOLL should have provided *additional or different* warnings regarding the same risk of unintended treatment is precisely the type of claim preempted by *Riegel*. *See Riegel*, 552 U.S. at 329 ("Surely . . . the MDA would pre-empt a jury determination that the FDA-approved labeling for a pacemaker violated a state common-law requirement for additional warnings.")[5].

***Express Warranty (Count IV).*** Plaintiffs' express warranty claim brought under La. Rev. Stat. § 9:2800.58 is also preempted. The Amended Complaint now alleges specific express warranties, including "warranties that the device would only deliver shocks when life-threatening arrhythmias are detected" and "warranties that the device would function safely during normal use." (Am. Compl. ¶ 142). But the LifeVest's FDA-approved labeling and IFU do *not* warrant that

---

[5] The Supreme Court's recent *Durnell* decision confirms that where a federal agency has performed its "central and comprehensive role" in making labeling determinations, a plaintiff's state-law demand for additional or different warnings is preempted as a matter of law. 2026 WL 1825691, at *9.

the device will only deliver shocks when life-threatening arrhythmias are present. To the contrary, the labeling and IFU expressly warn that a patient may receive a shock while conscious or while the patient's heart is beating normally if the patient does not utilize the response buttons during the alarm sequence. (M. Mims Decl. Ex. 3). The device's labeling and IFU, which constitute the express representations ZOLL is authorized to make under its PMA, are entirely consistent with the known possibility of unintended treatment shocks.

Plaintiffs do not identify any specific document, marketing material, or communication in which ZOLL allegedly warranted that the device would only shock patients during actual rapid arrhythmias—VT and VF. Instead, they allege the existence of such warranties in generic terms. Express representations about PMA devices are subject to comprehensive FDA regulation, and any claim that such representations were "untrue" would undermine the federal regulatory scheme. *See Hinkel*, 869 F. Supp. 2d at 747–48 (finding the plaintiff's LPLA express warranty claim was preempted as the plaintiff would need to prove that representations made regarding the device were untrue and such a determination "would clearly undermine the federal regulatory scheme.").

**C. Plaintiffs' claims are impliedly preempted under 21 U.S.C. § 337(a) and *Buckman*.**

Plaintiffs' claims are not only expressly preempted, they are also impliedly preempted under 21 U.S.C. § 337(a) and the Supreme Court's holding in *Buckman*. Congress has declared that all actions to enforce violations of the FDCA against manufacturers "shall be by and in the name of the United States." 21 U.S.C. § 337(a). Section 337(a) prohibits any private right of action to enforce FDA violations, vesting sole enforcement power with the federal government. *See Buckman,* 531 U.S. at 352. Thus, this provision impliedly preempts claims that seek to enforce FDA requirements that have no analogous common law basis. *See id.* at 349–50.

Plaintiffs' claims cannot escape implied preemption. By alleging, at most, that ZOLL

21

designed, manufactured, and sold the subject LifeVest in a defective and unreasonably dangerous condition, Plaintiffs imply that ZOLL violated governing FDA requirements and seek to enforce them. But the authority to enforce FDA regulations rests exclusively with the federal government, not private plaintiffs. Plaintiffs' claims, therefore, fail as a matter of law under *Buckman*.

The Amended Complaint's addition of "parallel claim" language does not alter this analysis. Plaintiffs' claims are impliedly preempted because they exist solely by virtue of the FDCA framework. Plaintiffs allege that the device deviated from ZOLL's "own manufacturing specifications and performance standards," but those specifications and standards are themselves imposed by and subject to FDA regulation under the PMA. There is no independent state-law duty that requires a medical device manufacturer to comply with its own PMA-approved specifications; that duty arises exclusively from federal law. Accordingly, Plaintiffs' claims are impliedly preempted under *Buckman* because they necessarily depend on the FDCA for their existence.

### D. Even if the claims were not preempted (which they are), Plaintiffs fail to state plausible claims under *Iqbal* and *Twombly*.

The Amended Complaint must be dismissed for an additional, independent reason – it fails to state a claim upon which relief can be granted. Under the standard established in *Iqbal* and *Twombly*, Plaintiffs must provide more than a "formulaic recitation of the elements of a cause of action" or "mere conclusory statements" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Despite the additional factual detail regarding Ms. Pellegrin's medical treatment, Plaintiffs still fall far short of this standard on every count.

**Count I — Manufacturing Defect**. Plaintiffs allege that the subject LifeVest "deviated in a material way from [ZOLL's] own specifications and performance standards" and "malfunctioned" by delivering "an inappropriate discharge." But Plaintiffs still never identify the alleged defect with specificity, how the subject LifeVest allegedly deviated from FDA

22

manufacturing specifications, nor identify any FDA regulation purportedly violated. LifeVest carries a known risk, approved by the FDA, of a treatment shock occurring based on a false positive VT or VF rhythm detection and a conscious patient's failure to press the response buttons.

The entirety of Plaintiffs' manufacturing defect theory is that the subject LifeVest delivered shocks when Ms. Pellegrin was not experiencing a life-threatening arrhythmia, and therefore the device must have been defective. But this is a textbook "malfunction theory" or "res ipsa" argument, alleging that because a known adverse event occurred, the device must have been defective. The Fifth Circuit squarely rejected this approach in *Funk*: "res ipsa loquitur" allegations were not sufficient to sustain her manufacturing defect claim. *Funk*, 631 F.3d at 782. Such conclusory pleadings are not sufficient to state a claim. *See id.*; *Reddick*, 2022 WL 715494, at \*5.

**Count II — Design Defect**. Plaintiffs' design defect claim now lists six purported "alternative designs." (Am. Compl. ¶ 109). Each of these "alternatives" relates to components of LifeVest that were specifically reviewed and approved by the FDA through the PMA process. Plaintiffs' design defect claim, even with these additions, remains insufficiently pleaded because Plaintiffs fail to allege any facts suggesting that these alternative designs were feasible at the time of LifeVest's FDA approval, that they would have been at least as safe and effective as the approved design, or that ZOLL could have adopted them without altering the PMA-approved design. The claim is nothing more than a post hoc assertion that, because a known adverse event occurred, the design must have been defective. That is not sufficient.

**Count III — Failure to Warn**. Plaintiffs allege ZOLL failed to provide adequate warnings or instructions regarding the risk of inappropriate discharge and resulting physical trauma. The Amended Complaint now lists six categories of allegedly inadequate or missing warnings. (Am. Compl. ¶ 128). But Plaintiffs still fail to explain what was inadequate about the existing FDA-

approved warnings, which expressly address the risk of unintended treatment shocks. Plaintiffs' claim reduces to an assertion that the warnings were not "enough" and is insufficiently pleaded.

**Count IV — Nonconformity to Express Warranty**. Plaintiffs' express warranty claim is insufficiently pleaded. The statute requires a plaintiff to identify an express warranty, plead that the express warranty "induced the claimant or another person or entity to use the product" and that the plaintiff's damages were "proximately caused because the express warranty was untrue." La. Rev. Stat. § 9:2800.58. Plaintiffs never identify any specific representation, plead that they or the prescribing physician relied on any representation, or plead that the representation was untrue. This is insufficient to state a claim.

### E. The loss of consortium claim fails because it is derivative of the preempted claims.

As the Court is sitting in diversity, Louisiana substantive law applies to Plaintiffs' claims. *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 750 (5th Cir. 1995). The Louisiana Supreme Court has expressly held that a loss of consortium claim is derivative of the predicate claim. *Ferrell v Fireman's Fund Ins Co.*, 696 So.2d 569 (La. 1997). The Amended Complaint's expansion of the claim into a standalone Count V with twelve additional paragraphs (Am. Compl. ¶¶ 156–67) does not change this analysis. Regardless of the level of factual detail provided, a derivative claim cannot stand when the underlying predicate claims are dismissed. *See Ferrell*, 696 So. 2d at 569.

**CONCLUSION**

Despite the opportunity to amend, Plaintiffs have failed to plead a single claim that survives preemption. They have not identified any specific federal requirement that ZOLL violated, any specific manufacturing process that failed, or any specific manufacturing specification from which the subject LifeVest deviated. They have incorrectly characterized LifeVest's regulatory pathway as 510(k) clearance when it is actually a Class III medical device that received full PMA. They

24

have relied on the mere occurrence of a known, FDA-reviewed adverse event—an unintended treatment shock—as the sole basis for inferring a manufacturing defect, which the Fifth Circuit has squarely held is insufficient. And they have added nothing more than legal conclusions, labeling each claim "parallel," without identifying any parallel federal requirement upon which each claim is premised. The Court should dismiss all claims against ZOLL, with prejudice and without leave to amend, as further amendment would be futile.

Respectfully submitted,

Dated: July 2, 2026

LISKOW & LEWIS, APLC

By: /s/ Michael C. Mims
Michael C. Mims, T.A. (#33991)
701 Poydras Street, Suite 5000
New Orleans, LA 70139
Telephone: (504) 581-7979
Telefax: (504) 556-4108
E-mail: mmims@liskow.com

Jenny A. Covington (pro hac vice)
Jenna L. Durr (pro hac vice to be submitted)
Matthew J. Smaron (pro hac vice)
**CARLTON FIELDS, P.A.**
80 South Eighth Street
Suite 2800
Minneapolis, MN 55402
612.605.9921
Jcovington@carltonfields.com
Jdurr@carltonfields.com
msmaron@carltonfields.com

*Counsel for ZOLL Medical Corporation*

## <u>CERTIFICATION</u>

I hereby certify that on this 2nd day of July, 2026, a copy of the foregoing pleading was served on all parties of record electronically via the Court's ECF system.

*/s/* Michael C. Mims
Michael C. Mims