**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MARK PELLEGRIN, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **No. 26-830** |
| **ZOLL MEDICAL CORPORATION** | **SECTION I** |

# ORDER AND REASONS

Before the Court is defendant Zoll Medical Corporation's ("Zoll") motion[1] to dismiss Mark and Norma Pellegrin's ("plaintiffs") first amended complaint ("complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the Court grants Zoll's motion to dismiss.

Also pending before the Court is plaintiffs' unopposed motion[2] to strike, which the Court also grants.

## I. BACKGROUND

The LifeVest wearable cardioverter defibrillator ("LifeVest") is a medical device, manufactured by Zoll, "intended to detect life-threatening arrhythmias and deliver electrical shocks to restore normal heart rhythm."[3] LifeVest is a "Class III medical device"[4] that received Premarket Approval ("PMA") from the Food and Drug Administration ("FDA") in December 2001.[5]

---

[1] R. Doc. No. 27.
[2] R. Doc. No. 32. Plaintiffs' motion to strike requested that the Court strike statements in plaintiffs' complaint and opposition to Zoll's motion to dismiss asserting that, contrary to Zoll's statements, the Zoll LifeVest did not receive premarket approval from the Food and Drug Administration. *See generally id.*
[3] R. Doc. No. 22 ¶¶ 16, 17; *see also* R. Doc. No. 31, at 1.
[4] *See id.*; R. Doc. No. 30, at 3.
[5] *See* R. Doc. No. 27-1, at 7; R. Doc. No. 27-5; *see also* R. Doc. No 27-6 (showing that the FDA has approved approximately 200 supplements to the LifeVest PMA).

After suffering heart failure in February 2025, plaintiff Norma Pellegrin ("Norma") was prescribed a LifeVest "[a]s part of her cardiac care."[6] However, shortly thereafter on March 5, 2025, plaintiffs allege that Norma's LifeVest administered two "inappropriate" discharges while she was "*not* experiencing a life-threatening arrhythmia."[7] According to plaintiffs, the first inappropriate discharge caused Norma's "neck to snap forward violently" and the second "caus[ed] a separate jolt to [her] body."[8]

Norma reported chronic neck pain after the incident, and her physician identified multiple "disc bulges and herniations" along her spine.[9] Plaintiffs acknowledge that medical records indicate that Norma has a history of chronic neck pain and "a history of cervical spine surgery," but plaintiffs attribute her worsening symptoms and injuries sustained on March 5, 2025, to a "defective" LifeVest.[10]

Norma received a "cervical epidural steroid injection" to address the pain; she "reported approximately eighty percent relief," but "continue[d] to suffer ongoing pain, functional limitations, and diminished quality of life."[11] Norma's husband, plaintiff Mark Pellegrin ("Mark"), alleges that as a result of her injuries he "suffered

---

Although plaintiffs initially disputed that LifeVest received PMA clearance, *see* R. Doc. No. 30, at 5, they have since abandoned that position in their motion to strike. *See generally* R. Doc. No. 32. Other courts have also recognized that LifeVest is a Class III medical device that received FDA PMA clearance. *Croci v. Zoll Med. Corp.*, No. 24-02137, 2025 WL 2307728, at *4 (S.D.N.Y. Aug. 11, 2025).

[6] R. Doc. No. 22 ¶¶ 12, 14.

[7] *Id.* ¶¶ 22–25 (emphasis added).

[8] *Id.* ¶¶ 24–25.

[9] *Id.* ¶ 96.

[10] *Id.* ¶¶ 15, 29 – 31.

[11] R *Id.* ¶¶ 46, 48, 54.

. . . loss of consortium."[12] After this lawsuit was filed, Norma unfortunately passed away on June 15, 2026.[13] Plaintiffs do not assert that her death was related to injuries allegedly suffered from inappropriate LifeVest shocks.[14]

Plaintiffs' complaint alleges four causes of action against Zoll pursuant to the Louisiana Products Liability Act ("LPLA").[15] Count one alleges that Norma's LifeVest was "unreasonably dangerous in construction or composition," *i.e.*, that it was unreasonably dangerous because of a manufacturing defect, that caused plaintiffs' injuries.[16] Count two asserts that the LifeVest is "unreasonably dangerous [in] design," and that "there existed an alternative design for the product that was capable of preventing or significantly reducing the risk of . . . inappropriate discharge

---

[12] *Id.* ¶¶ 77–78, 80.

[13] *See* R. Doc. No. 29.

[14] Pursuant to Rule 25(a) of the Federal Rules of Civil Procedure, to avoid dismissal of a deceased plaintiff's claim, a motion for substitution must be made "90 days after service of a statement noting the death." Plaintiffs filed a suggestion of death on July 13, 2026, but have not yet substituted a successor in interest with respect to Norma's claims against Zoll. Accordingly, the Court will continue to use "plaintiffs" to mean Norma Pellegrin and Mark Pellegrin as there are no named successors in interest to Norma's claims.

[15] Plaintiffs' original complaint alleged counts one through four pursuant to "Louisiana Products Liability Law." R. Doc. No. 1-1 ¶¶ 26–27. Although plaintiffs' first amended complaint substantively outlines the same four causes of action, it does not specifically assert that the claims are brought pursuant to Louisiana products liability law. Nevertheless, as this case was removed from Louisiana state court to this Court because of diversity jurisdiction pursuant to 28 U.S.C. § 1332, and plaintiffs' have not alleged a federal cause of action, plaintiffs' claims are grounded in Louisiana common law and "[t]he LPLA provides the exclusive remedy against a manufacturer for damages caused by its product." *Reddick v. Medtronic, Inc.*, No. 18-8568, 2021 WL 798294, at *4 & n.35 (E.D. La. Mar. 2, 2021) (citing La. Rev. Stat. Ann. § 9:2800.52), *aff'd*, No. 21-30169, 2022 WL 715494 (5th Cir. Mar. 9, 2022).

[16] R. Doc. No. 22 ¶¶ 84–104, 166; *see also* R. Doc. No. 1-1 ¶¶ 28–32.

and resulting physical trauma during normal use."[17] Count three claims that LifeVest is "unreasonably dangerous because" of "inadequate warning[s]," and the lack of adequate warnings resulted in plaintiffs' injuries.[18] Count four alleges that the failure of Norma's LifeVest to conform with Zoll's express warranties caused plaintiffs' injuries.[19] With respect to all four counts, plaintiffs assert that their claims "do[] not impose requirements different from or in addition to federal requirements."[20]

Defendants argue that plaintiffs' complaint should be dismissed pursuant to Rule 12(b)(6) because federal law preempts their LPLA claims and plaintiffs' attempt to state parallel claims that avoid preemption are "conclusory" and "insufficiently pleaded."[21]

## II. STANDARDS OF LAW

### A. *Rule 12(b)(6) Motion to Dismiss*

Pursuant to Rule 12(b)(6), a district court may dismiss a complaint or part of a complaint when a plaintiff fails to set forth well-pleaded factual allegations that "raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547).

---

[17] R. Doc. No. 22 ¶¶ 105–23, 166; *see also* R. Doc. No. 1-1 ¶¶ 33–37.
[18] R. Doc. No. 22 ¶¶ 124–38, 166; *see also* R. Doc. No. 1-1 ¶¶ 38–42.
[19] R. Doc. No. 22 ¶¶ 139–55, 166; *see also* R. Doc. No. 1-1 ¶¶ 43–47.
[20] R. Doc. No. 22 ¶¶ 101, 120, 136, 154.
[21] R. Doc. No. 27-1, at 3–5.

A facially plausible claim is one in which "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

In assessing the complaint, a court must accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). However, "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim," and the Court does "not accept as true '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152–53 (5th Cir. 2010) (first citing *Twombly*, 550 U.S. at 555; and then quoting *Iqbal*, 556 U.S. at 678).

Furthermore, "the Court must typically limit itself to the contents of the pleadings, including attachments thereto." *Admins. of the Tulane Educ. Fund v. Biomeasure, Inc.*, No. 08-5096, 2011 WL 4352299, at *3 (E.D. La. Sept. 6, 2011) (Vance, J.) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). The Court may consider all "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[22] *Tellabs, Inc. v.*

[22] Courts "may consider documents attached to a motion to dismiss that are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Sullivan v. Leor*

*Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "It is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Jenkins v. Tahmahkera*, 151 F.4th 739, 747 (5th Cir. 2025) (quotations omitted). Courts may take judicial notice of federal regulatory materials in the public record, without converting a Rule 12(b)(6) motion to a motion for summary judgment. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).[23]

"Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)) (alteration in original).

### B. *Federal Preemption*

Federal preemption is derived from the Supremacy Clause of the United States Constitution, which states: "This Constitution, and the Laws of the United States, which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, § 2. Therefore, when a state law conflicts with a federal law, the federal law preempts the state law and negates its effect. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106–07 (1992). Federal preemption is "either express or implied." *Id.* at 98. Express preemption occurs when a federal statute directly conflicts with state law. *See id.* Implied preemption arises where "federal

*Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quotation marks and citations omitted).

[23] The Court takes judicial notice of the letter that Zoll received from the FDA confirming PMA approval for the LifeVest, R. Doc. No. 27-5, and the related administrative materials, R. Doc. Nos. 27-5, 27-6, 27-8, that Zoll provided as exhibits to its motion to dismiss. *See Funk*, 631 F.3d at 783.

regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," "compliance with both federal and state regulations is a physical impossibility," "or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. (citation modified).

The Supreme Court has found that, in many cases, products liability claims arising from the use of medical devices covered by the Medical Devices Amendments of 1976 ("MDA") to the Food, Drug, and Cosmetic Act ("FDCA") are expressly preempted by federal law. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 330 (2008); *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996).

The MDA centralized and delegated the regulation of medical devices to the FDA. *Riegel*, 552 U.S. at 315–16. To help the FDA maintain regulatory authority over medical devices, Congress explicitly preempted state oversight by enacting 21 U.S.C. § 360k(a). Section 360k expressly preempts state-law tort claims for injury caused by a medical device if "(1) the Federal Government has established requirements applicable to [the device]; and (2) the claims are based on state-law requirements that are different from, or in addition to, the federal ones, and that relate to safety and effectiveness." *Bass v. Stryker Corp.*, 669 F.3d 501, 507 (5th Cir. 2012) (quoting *Riegel*, 552 U.S. at 321–22) (citation modified).

The Supreme Court has concluded that Class III devices that undergo the PMA process satisfy the first prong of this analysis because the FDA requires them "to be made with almost no deviations from the specifications in [the relevant] approval

application," as it has "determined that the approved form provides a reasonable assurance of safety and effectiveness." *Riegel*, 552 U.S. at 323. As explained in *Reigel*,

> Premarket approval is a "rigorous" process . . . . The FDA . . . grants premarket approval only if it finds there is a "reasonable assurance" of the device's "safety and effectiveness" . . . It may thus approve devices that present great risks if they nonetheless offer great benefits in light of available alternatives . . . . The FDA evaluates safety and effectiveness under the conditions of use set forth on the label, . . . and must determine that the proposed labeling is neither false nor misleading . . . . Once a device has received premarket approval, the MDA forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness . . . . After premarket approval, the devices are subject to reporting requirements . . . includ[ing] the obligation to inform the FDA of new clinical investigations or scientific studies concerning the device which the applicant knows of or reasonably should know of, . . . and to report incidents in which the device may have caused or contributed to death or serious injury, or malfunctioned in a manner that would likely cause or contribute to death or serious injury if it recurred.

552 U.S. 318–19 (internal citations omitted). This rigorous approval process, which imposes requirements on the device, distinguishes PMA devices from "[m]ost Class III devices." *Bass*, 669 F.3d at 506. Most Class III devices undergo a process referred to as § 510(k) approval, where the FDA reviews the device to determine if it is "'substantially equivalent' to another device exempt from the PMA process." *Id.* at 507. In contrast to the rigorous PMA process, the § 510(k) approval process does not impose federal requirements on a device. *Id.* (citing *Lohr*, 518 U.S. at 493–94).

However, under certain circumstances, issues with devices that satisfy the first prong of the *Reigel* preemption inquiry may still form the basis of a products liability claim. When a manufacturer of such a device violates FDA regulations, a plaintiff may recover under state tort law theories provided that those theories "parallel" the

federal violation. *Riegel*, 552 U.S. at 330. For a parallel claim, the state-law duty must not impose any requirements that differ from or exceed the FDA requirements. *See id*. "Essentially, in a parallel claim, relief is sought under state law alleging that certain conduct of the defendant resulted in a breach of a state duty, that this conduct also resulted in a breach of an FDA-imposed federal regulation, and that certain damages resulted from this breach." *Chiasson v. Medtronic Inc*, No. 16-3552, 2016 WL 4191837, at *4 (E.D. La. Aug. 9, 2016) (Fallon, J.). "If the [p]laintiff fails to properly plead her parallel claim, that is, she pleads a violation of a state law that imposes different or additional regulations . . . her claim will be preempted." *Id.*

This parallel-claim exception to express § 360k preemption is narrow. *See id.*; *see also Bush v. Thoratec Corp.*, 837 F. Supp. 2d 603, 608 (E.D. La. 2011) (Fallon, J.) (describing the act of pleading a viable parallel claim as "threading the needle"). Even if the MDA does not expressly preempt a parallel state law claim, it may still be impliedly preempted if it "exist[s] solely by virtue" of FDA regulations. *Buckman*, 531 U.S. at 352–53.

Congress granted the FDA the sole authority to enforce violations of the MDA. *See id.* at 347–51. Because the federal government retains this exclusive authority, private litigants cannot sue for noncompliance based solely on FDA regulations. *Id.* at 353. Therefore, state law cannot give a plaintiff a right of action to enforce the MDA. *See id.* Such claims "exist[] solely by virtue" of the FDA's requirements, and private litigants cannot step into a regulatory role explicitly given to the federal government. *Id.* at 348–51; *see also In re Taxotere (Docetaxel) Products Liability*

*Litigation*, No. 162740, 2021 WL 1295087, at *2 (E.D. La. Apr. 7, 2021) (Milazzo, J.) (concluding that a Michigan statute allowing for manufacturer liability in situations where defendants "[i]ntentionally withhold[] . . . or misrepresent[]" information from the FDA was preempted under Buckman).

In other words, the plaintiff must identify a federal requirement and show that the manufacturer failed to comply with it. *See Funk v. Stryker Corp.*, 631 F.3d 777, 782 (5th Cir. 2011). But a plaintiff must also show that state law provides a right to recovery "that would reach the alleged wrong independent of the FDA process." *Wildman v. Medtronic, Inc.*, 874 F.3d 862, 868 n.6 (5th Cir. 2017). Furthermore, to survive a Rule 12(b)(6) challenge, the plaintiff must state with particularity both the state law claim and the reasons the parallel claim survives preemption. *See Funk*, 631 F.3d at 782 ("This complaint is impermissibly conclusory and vague; it does not specify the manufacturing defect; nor does it specify a causal connection between the failure of the specific manufacturing process and the specific defect in the process that caused the personal injury. Nor does the complaint tell us how the manufacturing process failed, or how it deviated from the FDA approved manufacturing process.").

## III. ANALYSIS

Zoll's LifeVest is a Class III medical device that "underwent [the] lengthy FDA premarket approval ('PMA') process before [its] commercial use." *Naquin v. Medtronic, Inc.*, No. 20-30793, 2021 WL 4848838, at *1 (5th Cir. Oct. 18, 2021). Thus, the first prong of the *Riegel* preemption test is "automatically" satisfied, *id.* at *2 (citing *Bass*, 669 F.3d at 507)), and plaintiffs' LPLA claims are preempted to the

extent they are based on requirements "'different from, or in addition to' federally imposed requirements." *Id.* (quoting 21 U.S.C. § 360k(a)). However, as previously mentioned, plaintiffs can avoid preemption if they specify a parallel LPLA claim, *i.e.*, a claim "where LPLA requirements align with FDA requirements," *id.* at *1, that is not "pleaded in an 'impermissibly conclusory and vague' fashion." *Id.* at *3 (citing *Funk*, 631 F.3d at 782).

Zoll argues that the MDA, 21 U.S.C. § 360k, preempts plaintiffs' claims because they "impose requirements different than or in addition to the FDA requirements for LifeVest," and plaintiffs have not sufficiently alleged that their LPLA claims mirror a corresponding equivalent federal violation.[24] Zoll also argues that the complaint, additionally and independently, fails to state a claim upon which relief can be granted.[25]

Plaintiffs counter that they have sufficiently alleged parallel state claims that would not impose additional or different requirements from federal regulations, and "alleged sufficient facts" to plausibly infer that Zoll "violated federal requirements."[26]

The Fifth Circuit has reasoned that the conclusions made through the FDA's PMA process are "entitled to preemptive effect." *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 930 (5th Cir. 2006); *see also Hinkel v. St. Jude Med., S.C.*, 869 F. Supp. 2d 739, 747 (E.D. La. 2012) (Barbier, J.) (recognizing that in *Gomez*, the Fifth Circuit applied an equivalent analysis to the test eventually prescribed in *Reigel*).

---

[24] R. Doc. No. 27-1, at 14, 16, 21.
[25] *Id.* at 22.
[26] R. Doc. No. 30, at 1–2, 18–19.

As explained below, the Court agrees with Zoll that plaintiffs have failed to plausibly allege a parallel claim for relief pursuant to the LPLA that is not preempted by federal law. Additionally, because Mark's loss of consortium claim is derivative of the injuries Norma allegedly suffered with respect to plaintiffs' LPLA claims, Mark's loss of consortium claim is subject to dismissal. *See Licciardi v. Sig Sauer, Inc.*, No. 26-123, 2026 WL 1429033, at *3 n.28 (E.D. La. May 21, 2026) (Milazzo, J.) ("Because Plaintiff Lopez's loss of consortium claim is derivative of Plaintiffs' LPLA and negligence claims, it is also subject to dismissal.").

**A. *Count One – Unreasonably Dangerous Manufacturing Defect***

To state a parallel manufacturing defect claim for a Class III medical device with PMA, a complaint should "specify" (1) "the manufacturing defect"; (2) a causal connection between the failure of the specific manufacturing process and the specific defect in the process that caused the personal injury; and (3) "how the manufacturing process failed or how it deviated from the FDA-approved manufacturing process." *Funk*, 631 F.3d at 782.

Plaintiffs assert that the inappropriate shocks that Norma's LifeVest administered were the result of a manufacturing defect because, if used as intended, a properly manufactured LifeVest would not have administered such shocks.[27] Plaintiffs also allege that any defects resulting in the "malfunctioning" of the device were the result of "deviation from [Zoll's] . . . own manufacturing specifications and performance standards."[28] In their opposition to Zoll's motion to dismiss, plaintiffs

[27] R. Doc. No. 22 ¶¶ 84–87.
[28] *Id.* ¶¶ 88, 102.

also claim, for the first time, that "the device failed to provide adequate alarms and vibrations to alert" Norma that a shock was imminent, contrary to the device features the FDA approved.[29]

Plaintiffs argue that the facts they allege are analogous in detail to those presented in *Bass,* wherein the Fifth Circuit found that the plaintiff had plausibly alleged a parallel claim. 669 F.3d at 510. However, in *Bass*, the plaintiff described a specific FDA manufacturing requirement, claimed that the defendant had violated that requirement, and detailed how the violation was connected to his injury. *See id*. The Court disagrees with plaintiffs.

Plaintiffs do not identify *any* FDA design or manufacturing requirements that impact the LifeVest, nor do they detail how Zoll's manufacturing process for LifeVest failed or deviated from any federal requirements. "Threadbare recitals" of the LPLA manufacturing defect elements and conclusory assertions are insufficient to state a claim. *Iqbal*, 556 U.S. at 678. Additionally, failing to plead any violation of a federal design or manufacturing requirement amounts to a failure to plead a parallel claim. *Rodriguez v. American Medical Systems, Inc.*, 597 F. App'x 226, 230 (5th Cir. 2014) (per curiam).

Furthermore, the Court finds plaintiffs' "vague and conclusory allegations" that the process deviated from Zoll's standard procedures and federal regulations are

[29] R. Doc. No. 30, at 3–4, 6. Plaintiffs raised this allegation after Zoll filed into the record an FDA report explaining: "Two failures must occur for an unnecessary shock to happen. First, the detection algorithm must falsely declare an arrhythmia to exist for the duration of the alarm sequence (at least 25 seconds). Second, the patient must fail to use the response buttons despite the alarms." R. Doc. No. 27-6, at 16.

more akin to those rejected in *Funk*. In *Funk*, the Fifth Circuit found that relying on a theory that the mere fact the device was defective or caused harm is indicative of a manufacturing defect is insufficient to support a plausible parallel claim. 631 F.3d at 781–82.

Plaintiffs' new assertion—that a manufacturing defect exists because the LifeVest did not alert Norma of the unnecessary shocks through "alarms and vibrations"— raised for the first time in their opposition to the motion to dismiss, fails to detail a parallel state claim for the same reasons. Furthermore, as this claim is not alleged in plaintiffs' complaint, it cannot cure her deficient pleading. *See Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424 (5th Cir. 2019) ("A plaintiff may not amend [its] complaint in [its] response to a motion to dismiss." (alterations in original) (quoting *Lohr v. Gilman*, 248 F. Supp. 3d 796, 810 (N.D. Tex. 2017))).

As plaintiffs have already amended their complaint once and have not requested further leave to amend, the Court will not construe any claims newly raised in their opposition to Zoll's motion to dismiss as such. *Law v. Ocwen Loan Servicing, L.L.C.*, 587 F. App'x 790, 796 (5th Cir. 2014) ("[A] party must 'expressly request' leave to amend." (citation omitted)); *see also Weyerhaeuser Co. v. Burlington Ins. Co.*, 74 F.4th 275 (5th Cir. 2023) (suggesting that the district court has discretion whether to construe claims newly raised in an opposition to a motion to dismiss as a motion for leave to amend).

Accordingly, plaintiffs' manufacturing defect claim is preempted and fails to state a claim pursuant to the LPLA. Plaintiffs have already received leave to amend once and have not requested further leave to amend their complaint. Therefore, count one will be dismissed with prejudice.

### B. *Count Two – Unreasonably Dangerous in Design*

To plead an unreasonably dangerous in design claim, plaintiffs must show that (1) "an alternative design for the product that was capable of preventing [her injury]" existed; "and (2) [t]he likelihood that the product's design would cause [her injury] and the gravity of that damage outweighed the burden on [Zoll] of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product.'" *Johnson v. Teva Pharms. USA, Inc.*, 758 F.3d 605, 612 (5th Cir. 2014) (quoting La. Stat. § 9:2800.56). "Failure to connect an alleged violation of federal design requirements to the LPLA claims is fatal to those claims." *See Reddick*, 2021 WL 798294, at *8.

Plaintiffs allege that Norma's injuries stem from a design that "created a substantial risk of inappropriate discharge during normal use."[30] According to plaintiffs, "technically feasible" "alternative designs" for LifeVest existed.[31] Plaintiffs assert that these alternative designs "would not impose an unreasonable burden on Zoll," and are capable of, and would have, "prevented or significantly reduced the risk of inappropriate discharge" and Norma's resulting injury. Boiled down, plaintiffs

[30] R. Doc. No. 22, ¶ 111.
[31] *Id*. ¶¶ 107, 114.

allege that—despite the FDA's conclusions to the contrary—LifeVest's design is unreasonably dangerous pursuant to the LPLA.

Absent an allegation analogizing a federal violation to their LPLA claim, such claims are clearly preempted pursuant to § 360k because they "amount[] to a 'state-law challenge' to the federally countenanced requirements for the device." *Hinkel*, 869 F. Supp. 2d at 746. "The FDA studied the [LifeVest] design through the PMA process and approved it. To permit a jury to second-guess the [LifeVest] design by applying the Louisiana statutory standard for unreasonably dangerous design would risk interference with the federally-approved design standards and criteria." *Gomez*, 442 F.3d at 930. Therefore, "federal law preempt[s] this state-law challenge to the design of the Class III FDA-approved [LifeVest]." *Id.*

Accordingly, as § 360k preempts plaintiffs' unreasonably dangerous in design claim, and as previously stated, because plaintiffs have amended their complaint once and have not requested to do so again, count two will be dismissed with prejudice.

### C. *Count Three – Unreasonably Dangerous Because of Inadequate Warning*

To plausibly allege a claim for inadequate warning, plaintiffs must plead facts showing that (1) Norma's LifeVest "was unreasonably dangerous because an adequate warning was not provided for a potentially dangerous characteristic existing at the time the product left [Zoll's] control;" (2) Zoll "failed to use reasonable care to provide an adequate warning of such characteristic;" and (3) "these failures deviated from FDA warning requirements." *Reddick*, 2021 WL 798294, at *9 (quoting La. Rev. Stat. Ann. § 9:2800.57) (citing *Gomez*, 442 F.3d at 930).

Additionally, with respect to a claim that a medical device is unreasonably dangerous due to inadequate warning, Louisiana applies the learned intermediary doctrine. *See Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098–99 (5th Cir. 1991). The learned intermediary doctrine provides that a manufacturer's obligation to consumers is "fulfilled when the . . . treating physician is informed of any potential side effects or risks from the [device's] use so that they may intelligently decide on its use and advise the patient." *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 267 (5th Cir. 2002) (quoting *McCarthy v. Danek Med., Inc.*, 65 F. Supp. 2d 410, 413 (E.D. La. 1999) (Lemelle, J.)). "The premise underlying a failure-to-warn claim in the learned intermediary context is that the patient is claiming that the manufacturer failed to adequately warn the *treating physician*." *Id.* at 268 (emphasis retained).

> In such circumstances, a medical device may be unreasonably dangerous because of an inadequate warning if: (1) the defendant failed to warn the plaintiff's doctor of a risk associated with the product that was otherwise unknown to the doctor; and (2) the failure to warn the doctor was both a cause in fact and the proximate cause of the plaintiff's injury . . . To prove causation, the plaintiff must show that "a proper warning would have changed the decision of the treating physician, *i.e.* that but for the inadequate warning, the treating physician would not have used . . . the product."

*Celino v. Biotronik, Inc.*, 536 F. Supp. 3d 89 (E.D. La. 2021) (Africk, J.) (citing *Willett*, 929 F.2d at 1098–99).

Plaintiffs' complaint alleges that there were inadequate or absent warnings with respect to: "the risk and frequency of inappropriate discharge," "the severe physical trauma that can result from device malfunction," the potential "need for additional monitoring or safeguards during use," the "specific circumstances or activities that increase the risk of malfunction," "the violent physical force of

discharge and the need to be in a safe position when discharge occurs," and "minimiz[ing] injury risk during use."[32] Plaintiffs also argue, for the first time in their opposition to the motion to dismiss, that Zoll "failed to warn that the alarm system might not adequately alert a conscious patient."[33] Plaintiffs assert that these inadequacies existed at the time Norma was prescribed her LifeVest, Zoll "knew or should have known" of the associated risks and potential for harm, and "[a]n adequate warning would have led Norma Pellegrin and her prescribing physicians to either decline to use the LifeVest or to use it in a manner that would have avoided the damage."[34]

Plaintiffs argue that the Fifth Circuit's analysis in *Hughes* is instructive.[35] In *Hughes*, the court found that the plaintiff stated a plausible parallel state law claim that was not expressly preempted. 631 F.3d at 770–71. The plaintiff alleged that the manufacturer's liability for a failure to warn was derived from its failure to accurately report "serious injuries and malfunctions" to the FDA, "as required by the FDA's MDR regulations." *Id. Hughes* also explicitly instructs that "failure to warn" claims "are not preempted, *provided* that such claims are premised entirely on violation of the applicable federal requirements." *Id.* at 770 (emphasis added).

---

[32] R. Doc. No. 22 ¶128.

[33] R. Doc. No. 30, at 10–11.

[34] R. Doc. No. 22 ¶¶ 129–133.

[35] R. Doc. No. 30, at 10–11, 13. The Court notes that plaintiffs appear to erroneously attribute the Seventh Circuit's reasoning and language in *Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010) to the Fifth Circuit. *See id.* at 13 & nn. 30–32 (quoting language from *Bausch* and indicating that it was the Fifth Circuit's reasoning in *Hughes*).

However, plaintiffs neither argue in their briefs nor allege in their complaint that Zoll violated the FDA's reporting requirements.[36] Indeed, plaintiffs' complaint does not reference any applicable FDA-approved warnings and is devoid of any suggestion that the warnings Zoll provided to Norma's physician deviated from any approved warnings or instructions.[37]

Absent a clearly alleged corresponding violation of an "FDA-approved warning or instruction," plaintiffs' inadequate warning claim "remain[s] too general and risks imposing liability on [Zoll] for a failure to give a warning that was not sanctioned by the FDA." *Reddick*, 2021 WL 798294, at *9; *see also Reddick*, 2022 WL 715494, at *4 (affirming that the plaintiff did not state a viable parallel state law claim because he "neglect[ed] to plead any applicable FDA-approved warnings or that [the manufacturer] departed from them"). Accordingly, plaintiffs' inadequate warning claim is preempted, and for the same reasons stated with respect to counts one and two, count three will be dismissed with prejudice.

---

[36] Plaintiffs suggest, hypothetically, that Zoll could be liable if it violated the FDA MDR regulations. *See id*. (stating that because Zoll has "a duty under federal law to supplement the labeling or to seek FDA approval for revised labeling," if it "acquired knowledge after FDA approval that the device's alarm system was inadequate to alert conscious patients in certain circumstances, [Zoll] had both a federal and state-law duty to warn of this risk"). However, plaintiffs never actually allege that Zoll violated such requirements.

[37] Notably, the FDA's publicly available "Summary of Safety and Effectiveness Data" lists potential adverse events associated with the LifeVest, including "inappropriate defibrillation," "[u]nsuccessful . . . defibrillation resulting in death or disability," and "[f]ailure resulting from random component failure." *See* R. Doc. No. 27-5, at 8, 14–18. It also details a study that examined the risk of "unnecessary shocks." *Id*.

### D. *Count Four – Failure to Conform with an Express Warranty*

To successfully plead an LPLA express warranty claim, plaintiffs must allege "with particularity," *see Wildman* 874 F.3d at 870, facts detailing: (1) the express warranty that Zoll made with respect to LifeVest; (2) that "the express warranty induced [Norma] to use the product;" and (3) that plaintiffs' "damage was proximately caused by the breach because the express warranty was untrue." *Reddick*, 2021 WL 798294, at *10 (citing La. Rev. Stat. Ann. § 9:2800.58).

Plaintiffs allege that Zoll provided them with express warranties that the device: "would only deliver shocks when life-threatening arrhythmias are detected"; "would function safely during normal use"; and "meets certain performance and safety standards."[38] Plaintiffs also generalize that Zoll made warranties "regarding the device's reliability and accuracy in detecting arrhythmias."[39] However, plaintiffs' complaint does not identify or reproduce any specific express warranty and instead relies on vague allegations. The complaint fails to "identity when, where, or how [Zoll] made the alleged warranty." *Naquin*, 2021 WL 4848838, at *3.

Plaintiffs argue, for the first time in their opposition, that the warranties are located in the FDA "labeling, instructions for use, and marketing materials" for LifeVest.[40] Confusingly, plaintiffs proceed to state that "[d]iscovery will establish the specific content of these materials."[41] That assertion undermines the plausibility of

---

[38] R. Doc. No. 22 ¶ 142.
[39] *Id.*
[40] R. Doc. No. 30, at 11.
[41] *Id.* at 16.

plaintiffs' argument that the "labeling, instructions for use, and marketing materials"—documents that plaintiffs assert they do not currently know the content of and will not know the content of until after discovery—induced Norma's LifeVest prescription in early 2025. Additionally, to warrant discovery, plaintiffs must plead sufficient factual support that there is "'a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d 584 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). As plaintiffs' allegations are vague, conclusory, and contradictory, they do not support a plausible express warranty claim and lack sufficient factual basis to warrant discovery. Furthermore, as previously explained, plaintiffs cannot cure deficiencies in their complaint by raising new claims in their opposition to Zoll's motion to dismiss.[42]

Regardless, even ignoring that these assertions are only raised in plaintiffs' opposition to the motion to dismiss and lack plausible factual support, such conclusory statements are insufficient to avoid preemption. *See Reddick*, 2022 WL 715494, at *3 (finding the plaintiff's statements "that the warranties came from [the manufacturer's] advertisements and its website" were insufficient because he "still fail[ed] to identify a specific web page or specific warranty terms"). Accordingly, plaintiffs' LPLA express warranty claim is preempted, and even if it was not, plaintiffs fail to plausibly allege facts sufficient to satisfy the 12(b)(6) pleading standard pursuant to *Twombly* and *Iqbal*. *See Wildman*, 874 F.3d at 867–68 (noting that even when express warranty claims escape preemption, they often fail for failing

[42] *See discussion infra* p. 14.

to "plead the specifics of the warranty" or sufficiently allege that a breach of the warranty caused the plaintiff's injury).

For the stated reasons, and because plaintiffs have already amended their complaint once and have not requested further amendment, count four will be dismissed with prejudice.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that plaintiffs' unopposed motion[43] to strike is **GRANTED**.

**IT IS FURTHER ORDERED** that Zoll's motion[44] to dismiss plaintiffs' complaint is **GRANTED** and plaintiffs' complaint is **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, August 18, 2026.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

[43] R. Doc. No. 32.
[44] R. Doc. No. 27.